**2016 UT App 4**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES CHRISTOPHER MCCALLIE,
Appellant.

Opinion
No. 20140148-CA
Filed January 7, 2016

Third District Court, Salt Lake Department
The Honorable Denise P. Lindberg
No. 131903319

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE A. TOOMEY concurred.

VOROS, Judge:

¶1     After an evening of drinking and card-playing, James Christopher McCallie and an acquaintance had an altercation involving a handgun. The acquaintance (Victim) got the worst of it, suffering a non-fatal gunshot wound to his abdomen. McCallie claimed self-defense, but the jury convicted him of aggravated assault, a third-degree felony. On appeal, McCallie contends that his right to remain silent was infringed when the prosecutor questioned why McCallie had not claimed self-defense in his police interview. We agree with McCallie that constitutional error occurred, but we agree with the State that the error was harmless beyond a reasonable doubt. We therefore affirm the conviction.

BACKGROUND[1]

¶2    Around 10:00 a.m. on March 30, 2013, Victim visited his aunt and uncle at their home. He brought a half gallon of whiskey for a day of drinking and cribbage. Sometime later, McCallie, who rented a room from Victim's aunt and uncle, returned home with an 18-pack of beer after completing a long-haul route as a truck driver.

¶3    McCallie and Victim drank, played cards, argued, and talked about guns. Victim asked to see McCallie's gun, and McCallie obliged. McCallie retired to his bedroom multiple times; each time, Victim followed and asked McCallie to come out and drink with him; each time McCallie joined him. At some point, McCallie and Victim's aunt got into a verbal confrontation. McCallie called her a derogatory name, and Victim demanded that McCallie apologize. McCallie refused; he "went to [his] room and . . . was going to go to bed . . . when [Victim] came in for the last time."

¶4    McCallie testified that as he sat on his bed, Victim stood over him with one foot on top of McCallie's feet and "both of his fists up." McCallie grabbed his gun from under his pillow. McCallie testified that he did not have his finger on the trigger but rather that he placed it "across the frame of the weapon." Then, according to McCallie, Victim grabbed the gun, McCallie pulled back on the gun, Victim fell on top of him, and when Victim fell, Victim "pushed the trigger and fired the weapon himself."

¶5    Victim gave a different version of events. He testified that McCallie invited him to his room for some brandy. Victim

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citation and internal quotation marks omitted).

followed McCallie down the hall to his room when, suddenly, McCallie turned around "and he's got a gun." Then, according to Victim, McCallie "[p]ulled back the hammer, raised it up and pointed it in [Victim's] face." Victim testified that McCallie said "How about I just fuckin' kill you?" Victim grabbed McCallie's wrist with one hand and the barrel of the gun with the other hand. As Victim tried to pull the gun away, it came down near his side, "and then the gun went off." Victim suffered a non-fatal gunshot wound to his abdomen.[2]

¶6    After his arrest, McCallie acted—to use his word— "belligerent" with police. He testified that they "were trying to read [me] my rights and do the interrogation . . . they were asking me what happened and it's like, 'I'm not telling you anything' and they read my rights and said I'm—'no, I don't understand my rights, I'm not telling you anything.'" On cross-examination, McCallie described the attempted interrogation:

> [Prosecutor:] [T]hen they offered you a Coke?
>
> [McCallie:] Yes.
>
> [Prosecutor:] And your answer was, yes, I'll have a rum and Coke.
>
> [McCallie:] Sure. I was being belligerent.
>
> [Prosecutor:] . . . And they came back and [said] we'll go get you a Coke and then you said not a problem, how about a six pack and a cigarette?
>
> [McCallie:] Yes.
>
> [Prosecutor:] And then you asked them, "Still don't understand why I'm here. What happened?"
>
> [McCallie:] Exactly.

---

2. The jury acquitted McCallie of the count of discharge of a firearm. Accordingly, his version of the shooting is most consistent with the jury's verdict.

[Prosecutor:] They said you're under arrest and you said for what? Yes?

[McCallie]: Yes.

. . . .

[Prosecutor:] And then [they] tried to explain and again you said, "For what? Why am I here?" And then they explained your rights.

[McCallie:] Yes.

[Prosecutor:] And then at one point [the detective] says what part of your rights do you not understand and your answer was "The part where you're fucking jerking me [around]. What the fuck am I doing here to begin with? You people woke me up."

[McCallie:] Yes.

[Prosecutor:] [The detective] tries to explain—this could be a real short thing. And you said, "No, I want to know what the fuck I am doing here in the first place . . . ."

¶7     Before trial, McCallie's trial counsel moved to exclude McCallie's police interview because he "stated numerous times that he didn't understand his *Miranda* rights and finally the State gave up and did not question [him] any further." The prosecutor responded that he would not elicit any testimony from the detective about the content of his interview with McCallie, because "that can be cast as us commenting on his right to remain silent." Accordingly, the detective testified about McCallie's demeanor, attitude, and general belligerence during the attempted interrogation but not about any of McCallie's statements.

¶8     However, in closing arguments, the prosecutor described the evolution of McCallie's story over time as proof that McCallie had fabricated it:

> [T]he facts that I've offered react together, show an evolution, a progression of what? Of the defendant's fabrication.
>
> . . . .
>
> The evolution of his story from the very beginning when they question him, what does he say? Why am I here? Why are you jerking me [around]? Nothing happened. You woke me up. You woke me up. He didn't say it was an accident. He doesn't say this was self-defense.

McCallie's trial counsel objected and moved for a mistrial on the ground that the prosecutor had "comment[ed] on [McCallie's] right to remain silent." The court denied the motion.

¶9     Ultimately, the jury acquitted McCallie of felony discharge of a firearm but convicted him of third-degree-felony aggravated assault. After the verdict, McCallie moved for a new trial, which the court denied.

ISSUES ON APPEAL

¶10     McCallie raises two challenges on appeal. First, he contends that the trial court committed constitutional error by denying his mistrial and new trial motions, because the prosecutor impermissibly commented on McCallie's exercise of his right to remain silent. Second, he contends that the trial court erred in denying his motion for a directed verdict based on the insufficiency of the evidence.

ANALYSIS

I. Constitutional Error

¶11     McCallie contends that the trial court erred "in denying [his] motion for mistrial and motion for a new trial, given the

State's comments regarding [his] exercise of his right to remain silent." The State contends that the prosecutor's closing argument "was not that Defendant had remained silent when given an opportunity to offer an innocent explanation for his conduct, but rather that his statements to the police and others were inconsistent with his trial testimony." Accordingly, the State maintains that "[t]his type of argument is proper."

¶12   "We review a trial court's ruling on a motion for a new trial under an abuse of discretion standard. At the same time, however, we review the legal standards applied by the trial court . . . for correctness . . . ." *State v. Billingsley*, 2013 UT 17, ¶ 9, 311 P.3d 995 (first omission in original) (citations and internal quotation marks omitted). If we determine the trial court erred, and "the error results in the deprivation of a constitutional right, we apply a higher standard of scrutiny, reversing the conviction unless we find the error harmless beyond a reasonable doubt." *State v. Calliham*, 2002 UT 86, ¶ 45, 55 P.3d 573; *see also Chapman v. California*, 386 U.S. 18, 24 (1967). "The State bears the burden of proving that an error passes muster under this standard." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993).

A.   The Prosecutor Impermissibly Commented on McCallie's Silence.

¶13   McCallie argues that "[t]he State's use of Mr. McCallie's silence as evidence of guilt violates his right against self-incrimination and was a critical error requiring reversal." He asserts that the prosecutor's statement during closing amounted to an argument that "McCallie made up the story later, otherwise he would have shared it at the time of interrogation."[3]

---

3. McCallie did not remain silent in the usual sense. But, as we explain below, for Fifth Amendment purposes controlling case law treats commenting on the suspect's statements about the interrogation—as opposed to statements about the crime—as tantamount to commenting on the suspect's silence.

¶14   The State, on the other hand, argues that the prosecutor "described how Defendant told the police not that he acted in self-defense or that it was an accident—as he did at trial—but that he did not know what happened because the police had just awakened him." Thus, the State argues that the prosecutor "did not raise the inference that silence equals guilt; in fact the [prosecutor] did not mention Defendant's silence at all. Instead, the [prosecutor] properly argued that Defendant's trial testimony was inconsistent with his prior statements to the police" and others.

¶15   The Fifth Amendment to the United States Constitution commands, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. And the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), requires "that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976). Implicit in the *Miranda* warning is the "assurance that silence will carry no penalty." *Id.* at 618. Consequently, where a defendant remains silent after hearing *Miranda* warnings, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* (footnote omitted); *see also State v. Wiswell*, 639 P.2d 146, 147 (Utah 1981).

¶16   In *Doyle*, the Supreme Court examined "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Doyle*, 426 U.S. at 611. The case involved two defendants, Doyle and Wood, who were arrested together, charged with a single sale of marijuana, and tried in separate trials about one week apart. *Id.* "The evidence at their trials was identical in all material respects." *Id.*

¶17 At those trials, the prosecution argued that "the discrepancy between an exculpatory story at trial and silence at time of arrest gives rise to an inference that the story was fabricated somewhere along the way." *Id.* at 616. To support this theory at Doyle's trial, the prosecutor elicited the following testimony from Doyle:

> Q. (By the prosecutor.) . . . You are innocent?
>
> A. (By Doyle.) I am innocent. Yes Sir.
>
> Q. That's why you told the police department and [the officer] when they arrived . . . about your innocence?
>
> A. . . . I didn't tell them about my innocence. No.
>
> Q. You said nothing at all about how you had been set up?
>
> . . . .
>
> A. Not that I recall, Sir.
>
> Q. As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of [the officer], "I don't know what you are talking about."
>
> A. I believe what I said [is] "What's this all about?" If I remember, that's the only thing I said. . . .
>
> Q. All right. But you didn't protest your innocence at that time?
>
> A. Not until I knew what was going on.

*Id.* at 614–15 n.5 (first and third omission in original). And at Wood's trial, the prosecutor asked Doyle why he didn't tell police that he had been framed; Doyle responded that he said to the detective "what the hell is all this about and he said you are under arrest for the suspicion of selling marijuana and I said you

got to be crazy. I was pretty upset." *Id.* at 622 n.4 (Stevens, J., dissenting).

¶18    The Supreme Court held that this "use for impeachment purposes of [the defendants'] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. And because "[t]he State has not claimed that such use in the circumstances of this case might have been harmless error," the Supreme Court reversed the convictions. *Id.* at 619–20.

¶19    Four years after issuing *Doyle*, the Supreme Court applied that precedent in *Anderson v. Charles*, 447 U.S. 404 (1980) (per curiam). *Anderson* involved a murder. The defendant was found with the victim's car. The defendant testified at trial, and his testimony about the car differed crucially from his statement to police at the time of his arrest. *Id.* at 404–06. The Supreme Court held that *Doyle* did not forbid impeaching a defendant's trial testimony about the crime with his police statement about the crime; the prosecutor's questions in that case "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409.

¶20    The *Anderson* Court distinguished *Doyle* on the ground that *Doyle* "involved two defendants who made no postarrest statements about their involvement in the crime." *Id.* at 407. However, as the Court acknowledged, that assertion was not literally true, at least as to Doyle. Doyle asked arresting officers, "What's this all about?" and "exclaimed 'you got to be crazy,' or 'I don't know what you are talking about.'" *Id.* at 407 n.2 (citations omitted). But the Court noted that both the majority and dissenting opinions in *Doyle* "analyzed the due process question as if both defendants had remained silent." *Id.* What matters, the Court explained, are post-arrest statements "about [a defendant's] involvement in the crime." *Id.* at 407.

¶21    Consequently, under *Anderson*, post-arrest statements about the suspect's involvement in the interrogation itself—such as "What's this all about?" "You got to be crazy," and "I don't

know what you are talking about"—are, for *Doyle* purposes, the equivalent of silence. Accordingly, the prosecutor may not use such statements to impeach a defendant's trial testimony. We thus must decide whether McCallie's post-arrest statements fall into this category of comments about his involvement in the interrogation or, on the contrary, whether they can be fairly described as comments about his involvement in the crime.

¶22 Discussing McCallie's police interview in closing argument, the prosecutor asked rhetorically, "[W]hat does he say? Why am I here? Why are you jerking me [around]? Nothing happened. You woke me up. You woke me up." Though more bellicose, these statements by McCallie are similar to statements by Doyle in his police interview: "What's this all about?" "You got to be crazy," and "I don't know what you are talking about." Both men were addressing the interrogation itself, not the crime for which they were being interrogated. And because the Supreme Court "analyzed the due process question as if [Doyle] had remained silent," *Anderson*, 447 U.S. at 407 n.2, we do the same, proceeding here as if McCallie had remained silent.[4]

¶23 The State also argues that because McCallie made statements to the police, his claim that he "'remained silent' at the police interview is incorrect." The State relies on the Supreme Court's decision in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), to argue that McCallie did not remain silent and made substantive statements to the police. The State argues that under *Berghuis*, no *Doyle* violation exists absent an affirmative invocation of the right to remain silent. In *Berghuis*, the Court held that a suspect who wishes to invoke his right to remain silent "must do so 'unambiguously.'" *Id.* at 381. The Court

---

4. We of course realize that suspects' statements feigning ignorance during a police interrogation may turn out to be "graphically inconsistent with their trial testimony." *Doyle v. Ohio*, 426 U.S. 610, 621 (1976) (Stevens, J., dissenting). But again, McCallie's statements and Doyle's statements are in this regard indistinguishable.

clarified that the defendant "did not say that he wanted to remain silent or that he did not want to talk to police. Had he made either of these simple unambiguous statements, he would have invoked his right to cut off questioning." *Id.* at 382 (citation and internal quotation marks omitted).

¶24  *Berghuis* does not control the present case. The Supreme Court has distinguished Fifth Amendment right-to-remain-silent cases from due process comment-on-silence cases. Thus, *Berghuis* holds that the Fifth Amendment right to remain silent, like the Fifth Amendment right to counsel, must be invoked unambiguously. *Id.* at 375–76, 381. And a plurality of the Supreme Court has held in the Fifth Amendment context that "[a] suspect who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege." *Salinas v. Texas*, 133 S. Ct. 2174, 2182 (2013) (plurality opinion).[5]

¶25  But the plurality also stated that "*due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings." *Id.* at 2182 n.3 (emphasis in original) (citing *Doyle,* 426 U.S. at 617–18 (1976)). The plurality's formulation of *Doyle's* holding emphasizes the suspect's having heard—not necessarily invoked—his *Miranda* rights. And there is no dispute here that McCallie heard his *Miranda* rights. Nor do we discern any intent by the *Salinas* plurality to abandon or narrow *Doyle*. And in *Doyle*, neither defendant "claimed the privilege and . . . Doyle did not even remain silent." *Doyle*, 426 U.S. at 627–28 (Stevens, J., dissenting). Thus, we cannot agree that in the post-*Miranda* context, a suspect must unambiguously invoke his right to remain silent to trigger *Doyle's* "assurance that silence will carry no penalty." *Id.* at 618 (majority opinion).

---

5. Justice Thomas, joined by Justice Scalia, concurred in the judgment of the Court on the ground that a prosecutor's comments on a defendant's precustodial silence do not violate the Fifth Amendment. *See Salinas v. Texas,* 133 S. Ct. 2174, 2184 (2013) (Thomas, J., concurring).

¶26    In sum, we conclude that the prosecutor committed a *Doyle* violation when he commented on McCallie's exercise of his right to remain silent. Having concluded a constitutional error occurred, we will reverse "unless we find the error harmless beyond a reasonable doubt." *State v. Calliham*, 2002 UT 86, ¶ 45, 55 P.3d 573; *see also Chapman v. California*, 386 U.S. 18, 24 (1967).

B.    The Constitutional Error Was Harmless Beyond a Reasonable Doubt.

¶27    Most constitutional errors do not automatically result in reversal. Barring structural error, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). *Doyle* errors are not structural. *See Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991)). Thus, we address whether we may confidently say, on the whole record, that the *Doyle* error here was harmless beyond a reasonable doubt.

¶28    In determining whether a *Doyle* error was harmless beyond a reasonable doubt, we may consider four factors:

> (1) whether the jury would naturally and necessarily construe the comment as referring to defendant's silence; (2) whether there was overwhelming evidence of defendant's guilt; (3) whether the reference was isolated; and (4) whether the trial court instructed the jury not to draw any adverse presumption from defendant's [silence].

*State v. Byrd*, 937 P.2d 532, 535 (Utah Ct. App. 1997) (alteration in original) (citation and internal quotation marks omitted).

¶29    First, we do not believe that the jury would have "naturally and necessarily" construed the prosecutor's comment

as a comment on McCallie's silence. *See id.* (citation and internal quotation marks omitted). As explained above, *Doyle* and *Anderson* require us to "analyze[] the due process question as if [McCallie] had remained silent." *Anderson v. Charles*, 447 U.S. 404, 407 n.2 (1980) (per curiam). But McCallie in fact made statements to police, and the prosecutor's improper comments referred to these statements. Given this factual context, we cannot say that a lay jury would naturally and necessarily have understood the prosecutor's reference as a comment on McCallie's silence in the Fifth Amendment sense. We therefore conclude that the first *Byrd* factor weighs in favor of harmlessness.

¶30    Second, we consider whether the evidence of McCallie's guilt was overwhelming. *See Byrd*, 937 P.2d at 535. Because the jury acquitted McCallie of discharge of a firearm and convicted him only of aggravated assault, we consider only the latter offense.

¶31    As this court explained in *Byrd*, "Courts have generally refused . . . to conclude that evidence was overwhelming in cases that ultimately rested on the jury's resolution of conflicting evidence, particularly where the defendant's credibility is involved." *Id.* at 536. However, on the point in question—whether McCallie's story had evolved over time—the evidence did not conflict and was overwhelming.

¶32    The prosecutor demonstrated the evolution of McCallie's story through a series of jailhouse phone calls. Portions of these recorded phone calls were played for the jury. In a call to his mother, McCallie stated that he needed Victim "to say this was an accident." A day later McCallie assured his mother that Victim would be a "team player" and would "say this was an accident." But a friend later told McCallie that Victim "was unwilling to say this was an accident," to which McCallie replied, "I told [Victim] we'd take care of him. Talk to him again. This will be well worth his while." He also asked the friend if she could "be pushy" with Victim "about saying this was an accident." Finally, McCallie told his mother, "I'm going a

different direction with the story now, it's self-defense now since [Victim] . . . doesn't want to play ball."

¶33 These phone calls, far more clearly than McCallie's belligerent statements to police, demonstrate that McCallie's story had indeed evolved over time. Thus, in closing argument, after summarizing these phone calls—but before mentioning McCallie's police interview—the prosecutor stated, "That's the evolution of the story." He continued, "At first it's got to be an accident. . . . All of a sudden it's self-defense because [Victim's] not playing ball . . ."

¶34 Furthermore, McCallie's own version of events at trial supported the charge of aggravated assault. McCallie testified that after Victim barged into his room "for the umpteenth time," McCallie felt threatened and so grabbed his loaded handgun from under his pillow, "c[a]me up with it," placed his finger "across the frame of the weapon," and ordered Victim out of his room. Under the law then in effect, "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another" constituted an assault. Utah Code Ann. § 76-5-102(1)(b) (LexisNexis 2012). Use of a dangerous weapon elevated the offense to aggravated assault. *Id.* § 76-5-103(1)(a).[6] Therefore, barring his recently evolved theory of self-defense, McCallie's testimony alone provided evidence on which the jury could reasonably have found the elements of aggravated assault.

¶35 Accordingly, we conclude that the second *Byrd* factor weighs in favor of harmlessness.

¶36 Third, the prosecutor's comment on McCallie's silence constituted an isolated reference. *See State v. Byrd*, 937 P.2d 532, 535 (Utah Ct. App. 1997). Although the comment occurred at a crucial junction of the trial—the prosecutor's rebuttal in closing

---

6. The same conduct meets the current definition of aggravated assault. *See* Utah Code Ann. § 76-5-103(1) (LexisNexis Supp. 2015).

argument—it occupied at most four lines of the transcript.[7] We therefore conclude that it constituted an isolated statement. Thus, this factor also weighs in favor of harmlessness.

¶37     Finally, the trial court did not instruct the jury not to draw any adverse inference based on the prosecutor's improper comment. *See id.* Accordingly, this factor weighs in favor of harm.

¶38     In sum, the *Byrd* factors weigh in favor of harmlessness. Because the prosecutor's isolated comment did not clearly refer to McCallie's silence, because the evidence that McCallie's story had evolved over time was overwhelming, and because McCallie's own version of events supported his conviction for aggravated assault, we conclude that we "may confidently say, on the whole record," that the *Doyle* error here "was harmless beyond a reasonable doubt." *See Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

## II. Sufficiency of the Evidence

¶39     McCallie also contends that the trial court erred in denying his motion for a directed verdict based on the sufficiency of the evidence. On appeal from a denial of a motion for a directed verdict based on the sufficiency of the evidence, "[t]he applicable standard of review is . . . highly deferential." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645. "The evidence is to be viewed in the light most favorable to the [S]tate." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183. And "[w]e will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (alteration in original) (citation and internal quotation marks omitted). When reviewing a directed

---

7. By comparison, the prosecutor's discussion of the jailhouse phone calls occupied thirty-four lines of transcript.

verdict, "the court is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *Id.* ¶ 32 (citations and internal quotation marks omitted).

## A.     We Review the Entire Record on Appeal.

¶40     The parties disagree on whether we may canvas the entire record for evidence supporting McCallie's conviction or are limited to evidence presented in the State's case-in-chief—that is, the evidence actually before the court at the time McCallie moved for a directed verdict.

¶41     In a criminal case, a defendant may move for a directed verdict of dismissal at the close of the State's case-in-chief or after the close of all the evidence. *See* Utah R. Crim. P. 17(p). If the defendant moves for a directed verdict at the close of the State's case, and if, as often happens, the court denies the motion, the defendant may call defense witnesses, after which the State may call rebuttal witnesses. The question is whether the appellate court may consider this post-motion evidence in reviewing the trial court's denial of the motion.

¶42     The State asks us to explicitly adopt the "waiver doctrine" or "waiver rule." Under this rule, "if the defendant elects to introduce evidence following the denial of a motion for a judgment of acquittal, appellate review of the defendant's conviction encompasses all of the evidence presented to the jury, irrespective of the sufficiency of evidence presented during the state's case-in-chief." *State v. Perkins*, 856 A.2d 917, 929 n.16 (Conn. 2004). The State argues that Utah "seems to implicitly follow" the waiver rule.[8]

---

8. The State describes the waiver rule as the prevailing view as well as the federal rule. *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.6(b) (3d ed. 2007). Our research bears out the State's characterization. *See, e.g., United States v. Foster*, 783 F.2d

(continued…)

¶43 McCallie contests this characterization. Further, he observes that, in any event, the State bases its sufficiency argument entirely on evidence presented in its case-in-chief; consequently, he argues, this court "ought to postpone ruling on this issue until a case comes before it with relevant facts from the entire case."

¶44 Our own research suggests that the Utah Supreme Court adopted the waiver rule some years ago. In *State v. Stockton*, 310 P.2d 398 (Utah 1957), the court held that presenting evidence after denial of a motion for directed verdict constitutes "waiver of the motion to direct":

> In jurisdictions where it is held to be the duty of the court, in a proper case, to direct an acquittal, it is the general rule that, if the entire evidence is sufficient to sustain a conviction, the introduction of evidence by the defense, after the court has refused to direct a verdict of acquittal at the close of the prosecution's case, amounts to a waiver of the motion to direct.

*Id*. at 400. The court added that a defendant "cannot complain of the insufficiency of the evidence to sustain the verdict, though

---

(…continued)
1082, 1085 (D.C. Cir. 1986) ("All eleven numbered circuits and the District of Columbia Court of Appeals are now on record . . . as adhering to the waiver rule"); *State v. Kinsella*, 2011 ND 88, ¶ 11, 796 N.W.2d 678 ("Further, our adherence to the waiver rule is consistent with the position taken by the federal circuit courts of appeals and the majority of state courts.") The waiver rule "eliminates the bizarre result that could occur in its absence, namely, that a conviction could be reversed for evidentiary insufficiency, despite evidence in the record sufficiently establishing guilt." *State v. Perkins*, 856 A.2d 917, 932–33 (Conn. 2004).

the State failed to make a case, if he himself proved one for it." *Id*. (quoting *State v. Potello*, 119 P. 1023, 1029 (Utah 1911)). *But see State v. Kihlstrom*, 1999 UT App 289, ¶ 9, 988 P.2d 949 (stating, in reviewing a denied motion to dismiss, that "this court's review of the sufficiency of the evidence is limited to the evidence adduced by the prosecution in its case-in-chief").

¶45   In any event, in the present case, McCallie himself has placed the entire record before us. In arguing that the trial court erred in denying his motion for directed verdict, McCallie relies not only on evidence presented in the State's case-in-chief, but also on the testimony of four defense witnesses, including his own. Accordingly, as concerns this case, the parties apparently agree that we may assess the sufficiency of the evidence in light of the entire record.

B.     The Evidence Supports McCallie's Conviction.

¶46   McCallie's argument that sufficient evidence failed to support his conviction rests on the severe intoxication of Victim, the State's key witness. Specifically, McCallie argues that the State "failed to make out its prima facie case because the evidence, which depended entirely on [Victim's] testimony, was based on a non-existent memory from extreme intoxication, and was so contradictory to the physical evidence, as to be utterly non-persuasive." Distilled to its essence, McCallie's argument goes to Victim's credibility. He maintains that, given Victim's extreme intoxication, "he would have had no or little ability to form a memory [of the events] at all. What this reflects is that [Victim] likely created [his] memories subsequently, when he was no longer so highly intoxicated."

¶47   No party disputes that Victim had a blood alcohol content (BAC) of .31. And at trial, an expert witness testified on behalf of the defense, explaining that someone who did not regularly drink and who had a BAC of .31 "would be non-functional," "they'd be out cold on this level, almost certainly." He anticipated that "[s]omeone who drank alcohol on a regular basis . . . would be significantly impaired." The expert explained

that at this level of intoxication, the ability "[t]o think, to understand, to remember, . . . and that sort of thing and to reason" would be significantly impaired. But on cross-examination the expert also explained that a seasoned drinker could tolerate higher levels of alcohol:

> Well, his brain is used to seeing blood alcohols that are more substantial and so he'll have, you know, adapted to that and, you know, be able—he'll be able to function more normally, not completely normal, he'll be able to function more normally on higher blood alcohols than, you know, a non-drinker or a rare drinker.

All relevant evidence was before the jury to consider, and we will not invade the province of the jury by reweighing it. *See State v. Montoya*, 2004 UT 5, ¶ 32, 84 P.3d 1183. "[I]t was the jury's prerogative to weigh [Victim's] testimony in light of the [expert testimony], and [Victim's] testimony, if believed, was sufficient to support a conviction" for aggravated assault. *See State v. Peterson*, 2015 UT App 129, ¶ 8, 351 P.3d 812.[9]

¶48  Moreover, viewing the evidence in the light most favorable to the State, as we must, *see Montoya*, 2004 UT 5, ¶ 29, we conclude sufficient evidence supports McCallie's aggravated assault conviction. "A person commits aggravated assault if the person commits assault . . . and uses a dangerous weapon . . . ." Utah Code Ann. § 76-5-103(1)(a) (LexisNexis 2012). Assault is, among other things, "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *Id.* § 76-5-102(1)(b). Taking Victim's testimony at face value—as it constitutes the evidence most favorable to the State—Victim testified that McCallie had a gun; that he "[p]ulled back the

---

9. We also note that it appears the jury apparently disregarded at least some of Victim's testimony, because it acquitted McCallie of one count of discharge of a firearm with injury.

hammer, raised it up and pointed it in [Victim's] face"; and that he uttered, "How about I just fuckin' kill you?" This alone constitutes sufficient evidence to uphold McCallie's aggravated assault conviction. Moreover, even if the jury found Victim's testimony wholly incredible, we conclude, as explained above, that McCallie's own testimony provided some evidence of every element of the crime of which he was convicted. *See supra* ¶ 34.

¶49     Accordingly, we hold that the trial court did not err in denying McCallie's motion for a directed verdict, because the State and the defense presented sufficient evidence to support McCallie's conviction.

CONCLUSION

¶50     In sum, we conclude that the prosecutor improperly commented on McCallie's right to remain silent, but that this error was harmless beyond a reasonable doubt. We also conclude that sufficient evidence exists to support McCallie's conviction. We therefore affirm.

_____