**2018 UT App 142**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CARLOS WALTER ARGUETA,
Appellant.

Opinion
No. 20160565-CA
Filed July 27, 2018

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 151906605

Marshall M. Thompson and Diana Pierson,
Attorneys for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
GREGORY K. ORME and JILL M. POHLMAN concurred.

TOOMEY, Judge:

¶1 Carlos Walter Argueta was convicted of burglary and forcible sexual abuse, both second degree felonies. *See* Utah Code Ann. §§ 76-6-202, 76-5-404 (LexisNexis 2017). He appeals his convictions, and we affirm.

BACKGROUND[1]

¶2     In June 2015, Victim and her Boyfriend were socializing with friends in their neighbor's backyard. Sometime after midnight Victim decided to go to bed, and she returned to her apartment while Boyfriend continued to socialize.

¶3     Victim and Boyfriend lived in a studio apartment in a building with four apartments. Victim left her keys in her front door lock—which automatically locked whenever the key was removed—so that Boyfriend could enter the apartment after she was asleep. She undressed and eventually fell asleep with her back to the door.

¶4     Somewhere between "deep sleep and still aware," Victim felt someone rubbing her buttocks and stroking her vagina. She initially thought Boyfriend was touching her, but realized it was someone else when she heard Boyfriend say, "Who the fuck are you?" over and over. Victim sat up and saw Boyfriend confronting another man in the apartment. She told Boyfriend the man had touched her and Boyfriend pushed the man against the dresser and told Victim to summon their neighbors.

¶5     The man tried to escape, apologized, and said that he had been looking for a bathroom. Boyfriend and the man wrestled into the hallway where Boyfriend tried to pin him against the wall. The man made it out the door of the apartment building and tried to run toward the street, but Boyfriend caught him and, with the help of two other men, pinned him down on the front lawn until the police arrived and arrested him. The man was Argueta.

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified). "We present conflicting evidence only as necessary to understand issues raised on appeal." *Id.*

¶6　According to Argueta's testimony at trial, he met Victim and her previous boyfriend at a bar eighteen months before the incident. They talked and drank until the bar was about to close. Argueta gave them a ride home to the same apartment building involved in this case, and he loaned the boyfriend twenty dollars. The boyfriend told Argueta he could come collect the money whenever he wanted.

¶7　Argueta testified he tried to collect the money five or six times over the next year and a half. He stated that on the night of this incident, he was in the area and decided to try again to collect his twenty dollars. He went to Victim's apartment and saw that the door was slightly open and the keys were in the lock. He decided to put the keys inside the apartment as a "good deed." Argueta testified he put the keys on the dresser and as he was turning back toward the door, Boyfriend entered the apartment.

¶8　After Argueta's arrest, a police officer (Officer) gave Argueta his *Miranda* rights and had him sit on the curb while Officer questioned Victim. Though Officer had not asked Argueta any questions, Argueta overheard Victim saying he had touched her, and Argueta volunteered that she was "lying," that he met her at a bar, and that he merely left the keys in the apartment.[2]

---

2. Argueta initially recounted a different version of these events. Specifically, in his opening brief he asserts that "[b]efore he was arrested and read his rights, [he] spoke briefly with the police," explaining that he met Victim before this incident and that he found the keys in the door. "The police officers then read [him] his rights, and he chose to remain silent thereafter." Argueta cites his testimony at trial as a basis for this sequence of events. In his reply brief, Argueta, relying on Officer's testimony, states that he "was arrested, was read the *Miranda* warnings, and chose to remain silent before making a few limited statements to

(continued…)

¶9 At a pretrial hearing in this case, the State, under rule 404(b) of the Utah Rules of Evidence, sought to admit evidence of several of Argueta's prior acts. The district court ruled that although the acts were not admissible in the State's case in chief, two of them would be admissible in rebuttal if Argueta testified during trial "as to his intent with regard to his entry, if any, into [Victim's] residence." The evidence involved a 2010 incident in which Argueta was found trespassing near another woman's house (the trespassing incident) and a 2014 incident in which Victim saw Argueta looking in the window of her apartment (the peeping incident).

¶10 After a two-day trial, a jury convicted Argueta of burglary and forcible sexual abuse, and the court sentenced Argueta to two concurrent terms of one to fifteen years in prison. Argueta appeals.

ISSUES AND STANDARDS OF REVIEW

¶11 Argueta raises several issues on appeal. First, he contends the prosecutor violated his constitutional right to remain silent. "Though underlying factual matters are within the discretion of the [district] court, whether a given set of facts gives rise to a constitutional violation is a matter of law," which we review for correctness. *State v. Maas*, 1999 UT App 325, ¶ 13, 991 P.2d 1108.

¶12 The second and third issues involve Argueta's contention that the district court erred by admitting evidence of the

---

(…continued)
police." When asked about this discrepancy at oral argument, Argueta's counsel agreed with the State that Argueta made his statements post-*Miranda*. Thus, both parties acknowledge the sequence of events that we recount here: Argueta was arrested, given the *Miranda* warning, and thereafter made statements to the police.

trespassing and peeping incidents under rules 404(b) and 403 of the Utah Rules of Evidence. We review the district court's decision to admit or exclude evidence for an abuse of discretion. *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032.

¶13 Next, Argueta contends his trial counsel was ineffective because he failed to make several renewed objections with respect to the rule 404(b) evidence and failed to move for a mistrial. Whether trial counsel was ineffective presents a question of law. *State v. Doutre*, 2014 UT App 192, ¶ 9, 335 P.3d 366.

¶14 Finally, Argueta contends the cumulative effect of these errors requires reversal. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim or error and reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. White*, 2016 UT App 241, ¶ 14, 391 P.3d 311 (quotation simplified).

ANALYSIS

I. The Alleged Doyle Violation

¶15 First, Argueta contends the prosecutor violated his constitutional right to remain silent by using his silence to impeach his testimony at trial, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). Argueta argues the prosecutor improperly questioned him "about his post-arrest silence" and then drew "negative inferences from that silence throughout the remainder of the trial."

A. Additional Background

¶16 During trial, the prosecutor asked Argueta about his interaction with the police and had the following exchange with him:

Q: Mr. Argueta, you said that the officer said, "What happened?" and you tried to explain. Is that correct?

A: Yes.

Q: But everything you've just told us for the last 25 minutes you did not tell the officer, did you?

A: I told him about the keys.

Q: You told him that you put the keys inside the apartment, right?

A: Yes.

Q: Didn't tell him about meeting the boyfriend?

A: He never asked. He said that he was going to read my rights to me.

Q: You said you were going to explain. You just said you explained, right?

A: I explained to him what I just mentioned.

Q: Just about the keys?

A: That I had met [Victim] before. That's all.

Q: Just the one statement, right?

A: Because he did not want to hear any more.

Q: The officer stopped you from talking?

A: He told me that he could read my rights.

¶17 Later, the prosecutor continued questioning Argueta:

Q: So, Mr. Argueta, you said the officer asked you to explain what happened and you told him two things, correct?

A: Yes.

Q: You told him you left the keys in the apartment; is that correct?

A: I told him to go check where I had left the keys.

Q: And you said that you met [Victim] at a bar?

A: Correct.

Q: You did not say anything else that you've testified to today?

A: I just told him that I had met her at a bar.

Q: So the answer is "yes."

A: Yeah, I wouldn't say "yes."

Q: You didn't talk to him about what bar, didn't talk to him about the boyfriend, you didn't talk to him about money being owed, you didn't say any of that, correct?

A: No.

¶18 The prosecutor referred to this exchange during her initial closing argument and again during rebuttal.

B.     The Prosecutor's Questioning Did Not Violate Argueta's
       Right to Remain Silent

¶19     The Fifth Amendment to the United States Constitution
requires that persons who are in custody and subject to
interrogation must be "advised immediately" that they have the
right to remain silent and that anything they say may be used
against them. *Doyle v. Ohio*, 426 U.S. 610, 617 (1976); *see Miranda
v. Arizona*, 384 U.S. 436, 444–45, 467–68 (1966). Further, the
assurance that "silence will carry no penalty" is "implicit to any
person who receives the [*Miranda*] warnings." *Doyle*, 426 U.S. at
618. Under *Doyle*, it is "fundamentally unfair and a deprivation
of due process" to allow a prosecutor to use a defendant's silence
at the time of arrest "to impeach an explanation subsequently
offered at trial." *Id.*

¶20     Argueta argues the district court erred "by allowing the
prosecutor, over trial counsel's objections, to question [Argueta]
about his post-arrest silence and then draw negative inferences
from that silence throughout the remainder of the trial." The
problem with this argument is that Argueta did not remain
silent after he was arrested and given a *Miranda* warning. Thus,
the prosecutor's questioning drew negative inferences about his
statements, not his silence.[3]

---

3. The prosecutor's questions asked about information Argueta
omitted in the statements he made to police. It could be argued
an omission involves a type of silence—silence as to particular
details intentionally left uncommunicated. Under this theory, the
prosecutor improperly drew attention to Argueta's prior silence
as to the details of the explanation he gave at trial. But *Anderson
v. Charles*, 447 U.S. 404 (1980) (per curiam), specifically rejected
this "formalistic understanding of silence" and held that *Doyle*
does not require the protection of such omissions. *See id.* at 409
(internal quotation marks omitted).

¶21   Argueta asks us to treat his limited statements as the equivalent of silence. He asserts that in *Doyle*, the defendant made certain statements after a *Miranda* warning,[4] but the Court "analyzed the due process question as if [the] defendant[] had remained silent." *Anderson v. Charles*, 447 U.S. 404, 407 n.2 (1980) (per curiam). Argueta argues that "silence doesn't mean no statements at all" and asserts his statements can be considered silence because he invoked the right to remain silent[5] and the statements were not detailed and did not go to the elements of the crime.

¶22   In *State v. McCallie*, 2016 UT App 4, 369 P.3d 103, this court analyzed whether certain statements to police could be considered "the equivalent of silence" as they were treated in *Doyle*. *Id.* ¶ 21. This court pointed out that in *Doyle*, the defendants "'made no postarrest statements about their *involvement in the crime*.'" *Id.* ¶ 20 (emphasis added) (quoting *Charles*, 447 U.S. at 407). We determined that "post-arrest statements about the suspect's involvement in the interrogation itself" are "the equivalent of silence," while "comments about [the suspect's] involvement in the crime" are not considered silence. *Id.* ¶ 21.

¶23   Here, Argueta's statements to Officer were that Victim was "a liar, that he [had] met her at a bar, and that the keys were

---

4. In *Doyle*, after receiving his *Miranda* warning, the defendant asked the arresting officer, "What's this all about?" *Doyle v. Ohio*, 426 U.S. 610, 614 n.5 (1976) (quotation simplified). After the officer explained the reason for his arrest, the defendant stated, "[Y]ou got to be crazy," or, "I don't know what you are talking about." *Id.* at 622–23 n.4 (Stevens, J., dissenting).

5. In *State v. McCallie*, 2016 UT App 4, 369 P.3d 103, we clarified that a suspect need not "unambiguously invoke his right to remain silent to trigger *Doyle*'s 'assurance that silence will carry no penalty.'" *Id.* ¶ 25 (quoting *Doyle*, 462 U.S. at 618).

left in the door, and that he had left the keys in the house." These statements were unrelated to Argueta's interrogation and indeed, were not made in response to police questioning. The statements go directly to Argueta's involvement in the crime and offer an alternative explanation for his entry into Victim's apartment. Thus, we cannot consider them as the equivalent of silence, and proceed on the basis that the prosecutor commented on Argueta's post-*Miranda* statements regarding the crime.

¶24    The State argues the prosecutor's commentary did not violate the rule articulated in *Doyle* because her questioning was akin to that in *Charles*, in which the Supreme Court held that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." 447 U.S. at 408.

¶25    In *Charles*, a defendant charged with murder testified at trial that he stole a vehicle from a store parking lot. *Id.* at 405. When interrogated by police, the defendant stated that he stole the car from a different location. *Id.* The prosecutor highlighted this difference in the defendant's testimony at trial. *Id.* at 405–06. The defendant appealed, arguing the prosecutor's questions violated his constitutional rights under *Doyle*. *Id.* at 406–07.

¶26    The Supreme Court reiterated that *Doyle* bars the use of a criminal defendant's silence after the *Miranda* warning is given. But it held that

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408. The Supreme Court further explained, "Each of two inconsistent descriptions of events may be said to involve

'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." *Id.* at 409.

¶27 We agree with the State that under *Charles*, the prosecutor's questions did not violate Argueta's right to remain silent. The main thrust of *Charles* clarifies that when a defendant is questioned about how a prior explanation differs from one given at trial, there is "no unfair use of [a defendant's] silence" because a defendant "has not been induced to remain silent." *Id.* at 408. Argueta voluntarily made statements to Officer after he was given the *Miranda* warning, and his statements related directly to his involvement in the crime. The prosecutor's questions "were not designed to draw meaning from silence" but to "elicit an explanation" for the exculpatory details omitted from his prior statement to Officer. *See id.* at 409. The prosecutor's questions asked Argueta why, if his testimony at trial were true, he omitted many of those details in the explanation he gave to Officer. This questioning did not refer to Argueta's "exercise of his right to remain silent." *See id.* at 408.

¶28 Argueta argues that *Charles* does not apply because his trial testimony was consistent with his prior statement, in that none of the details he gave at trial contradict the statement he gave Officer. He argues that *Charles* applies only to cross-examination of "prior inconsistent statements," whereas Argueta was cross-examined regarding "additional details" he failed to include in his prior statement.

¶29 We are unpersuaded. The primary concern of *Doyle* and *Charles* was to ensure that a defendant's silence would "carry no penalty." *Doyle*, 426 U.S. at 618; *see Charles*, 447 U.S. at 408. We see no difference in impeaching a defendant's prior inconsistent statement and impeaching a prior statement that omitted exculpatory details where a defendant "has not been induced to remain silent." *See Charles*, 447 U.S. at 408. In both cases, there is no "unfair use of silence." *Id.* Thus, the prosecutor did not

violate the rule articulated in *Doyle* when she questioned Argueta regarding his prior statements to police.

## II. The Rule 404(b) Evidence

### A.    Additional Background

¶30    At a pretrial hearing, the district court heard evidence of several prior acts, two of which are relevant here. First, the court heard evidence that Argueta pleaded guilty to trespassing after he was found near a woman's residence in the early hours of the morning. The woman thought there was an intruder in her house and called the police. Upon arrival, the responding officer saw Argueta emerging from her backyard, but there was no evidence he entered her house. The prosecutor argued that this evidence was admissible under rule 404(b) of the Utah Rules of Evidence to show intent regarding Argueta's entry into Victim's apartment. Specifically, she argued that the doctrine of chances could be used to rebut Argueta's testimony that he entered the apartment innocently, merely with the intent of placing the keys inside the door.

¶31    Second, the prosecutor sought to admit evidence that Victim saw Argueta looking through her window in 2014, and that she and a previous boyfriend confronted him and insisted he leave. At the hearing, Argueta's counsel argued that "[e]very factor" of Victim's eyewitness identification of Argueta weighs "against finding that this is a good eyewitness identification." Trial counsel stated that if the prosecution were to put on evidence of the peeping incident, the defense would have to call an eyewitness-identification expert. Trial counsel argued that this would "shift the jury's focus" and the parties would "end up spending more time trying the uncharged peeping tom incident" than trying the charged crimes.

¶32    The court stated that evidence of the trespassing incident and the peeping incident was not admissible in the State's case in chief, but would be admissible "if in fact the defendant puts

his intent of going inside of the apartment in play." At trial when Argueta testified concerning his intent, the court admitted evidence of each incident during the State's cross-examination of Argueta.

B.      The Trespassing Incident

¶33     Argueta argues the district court improperly relied on the doctrine of chances to admit evidence of the trespassing incident. Although we agree that this evidence was admitted in error, we affirm on the basis that it was not prejudicial.

¶34     Rule 404(b) of the Utah Rules of Evidence prohibits "[e]vidence of a crime, wrong, or other act" from being admitted "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." But this evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). "In some circumstances, evidence of prior misconduct can be relevant under the so-called 'doctrine of chances.'" *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. The doctrine of chances is a "theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *Id.* (quotation simplified). This doctrine defines circumstances where prior bad acts can properly be used to rebut certain defenses, including those based on mistake and lack of intent.[6]

---

6. Argueta argues the court did not have a proper, noncharacter purpose for admitting the evidence of the trespassing incident under rule 404(b) of the Utah Rules of Evidence. He argues the court incorrectly used the doctrine of chances as an alternative purpose for admitting the evidence. In response, the State argues that the court admitted the evidence to prove Argueta's intent in entering Victim's apartment, which is a valid noncharacter

(continued…)

*State v. Lopez*, 2018 UT 5, ¶ 49, 417 P.3d 116; *Verde*, 2012 UT 60, ¶ 47.

¶35    *Verde* outlined four foundational requirements that must be satisfied to admit evidence under the doctrine of chances. *Verde*, 2012 UT 60, ¶ 57; *accord State v. Lowther*, 2017 UT 34, ¶ 32, 398 P.3d 1032. These "foundational requirements are (1) materiality, (2) similarity, (3) independence, and (4) frequency." *Lowther*, 2017 UT 34, ¶ 32; *Verde* 2012 UT 60, ¶¶ 57–61. Argueta asserts that under these elements the trespassing incident is inadmissible, and we agree. Because we determine that the evidence does not meet the second and fourth foundational requirements and conclude the court erred on that basis, we do not analyze the first and third requirements.[7]

---

(…continued)

purpose listed under rule 404(b). Given that the record shows the court stated the evidence was "being brought in to show . . . his intent was to go into the house," and that the evidence would be admissible only "should the defendant testify as to his intent with regard to his entry, if any, into the residence," we agree with the State that the court's use of the doctrine of chances to admit the evidence was tied to a proper, noncharacter purpose.

7. The State argues that "the trespass evidence did not have to satisfy *Verde*'s foundational requirements to be admissible under rule 404(b)," and that "prior-acts evidence" need not "satisfy the doctrine of chances' foundational requirements to be admissible." While the State is correct that *all* prior-acts evidence need not meet the foundational requirements to be admissible under rule 404(b), it is incorrect that the trespassing evidence did not have to satisfy the requirements. The Utah Supreme Court in *State v. Lowther*, 2017 UT 34, 398 P.3d 1032, made clear that "under the doctrine of chances, evidence must not be admitted absent satisfaction of [the] four foundational requirements [outlined in *Verde*]." *Id.* ¶ 32 (quotation simplified). Thus,

(continued…)

¶36     The second and fourth foundational requirements—similarity and frequency—"interact with each other to become a safeguard against the doctrine of chances becoming a work-around for the admission of otherwise improper propensity evidence." *Lopez*, 2018 UT 5, ¶ 57. Because the doctrine of chances scrutinizes the objective improbability of certain incidents, both elements are "important inputs for determining this improbability; the less similar the acts, the more probable it is that they would occur in the general population. And the less frequently they occur in the general population, the more it is objectively improbable that so many incidents would occur randomly." *Id.* ¶ 59 n.12 (quotation simplified). Thus, we review similarity and frequency in tandem. *See id.*

¶37     First, we determine whether the acts were sufficiently similar. This element requires that "the similarities between the charged and uncharged incidents . . . be 'sufficient to dispel any realistic possibility of independent invention.'" *Lowther*, 2017 UT 34, ¶ 36 (citation omitted). "The more similar, detailed, and distinctive the various accusations, the greater is the likelihood that they are not the result of independent imaginative invention," which increases "the likelihood that the defendant committed one or more of the actions." *Id.* (quotation simplified). Although *Verde* states the other incidents must be "roughly similar" to the charged crime and "fall into the same general category," 2012 UT 60, ¶¶ 58–59 (quotation simplified), it also requires "some *significant similarity* [between the two incidents] to suggest a decreased likelihood of coincidence," and that the similarities be "sufficient to dispel any realistic possibility of independent invention," *id.* ¶¶ 58–59 (emphasis added) (quotation simplified).

---

(…continued)
because evidence of the trespassing incident was admitted under the doctrine of chances in the context of rule 404(b), it must satisfy the foundational requirements of *Verde*.

¶38    The similarities between the trespassing incident and Argueta's charged crime are insufficient to meet the second foundational requirement. Although both scenarios involved Argueta's presence at a woman's residence in the early morning hours and Argueta's offer of an innocent explanation for being there, one incident was a trespassing charge where there was no evidence of entry, and the other involved burglary and sexual abuse charges. In the trespassing incident, Argueta was seen near the woman's yard. There was no evidence he entered the residence and there was no evidence given at trial, other than his presence on the property, that demonstrated an unlawful intent to enter the house. In this case, Argueta entered Victim's building and her individual apartment, was found there by Boyfriend and Victim, and was immediately accused of sexually touching Victim. Although Argueta offered an innocent explanation for his entry, an unlawful intent for his entry was immediately apparent. Thus, these incidents are not sufficiently similar to suggest a decreased likelihood of coincidence.

¶39    Next we analyze the frequency element, which requires that the defendant "have been accused of the crime or suffered an unusual loss more frequently than the typical person endures such losses accidentally." *Lowther*, 2017 UT 34, ¶ 38 (quotation simplified). Even one other instance is sufficient to satisfy this element, though "courts should properly have in mind the principle that the fewer incidents there are, the more similarities between the crimes there must be." *State v. Lomu*, 2014 UT App 41, ¶ 32, 321 P.3d 243 (deciding the frequency element was satisfied where only two crimes were involved but were "almost identical"). Here, there is only one other incident being compared with the crime in question.[8] We previously explained that the incidents did not have sufficient similarities to meet the

---

8. The State argues that the peeping incident should also be considered under the frequency element, but the peeping incident was not analyzed under the doctrine of chances and was admitted separately under rule 404(b).

second foundational requirement, *see supra* ¶ 38, and one trespassing conviction, almost five years earlier, is not more than a typical person can experience accidentally. We thus determine that the frequency element has not been met.

¶40 Because two of the four foundational requirements could not be satisfied, we conclude the district court erred in admitting the trespassing incident under the doctrine of chances. One trespassing conviction does not increase the statistical likelihood that on a different occasion Argueta entered Victim's apartment with unlawful intent. *See Lowther*, 2017 UT 34, ¶ 21 ("*Verde's* foundational requirements assess whether a body of prior bad acts evidence is being employed for a proper, non-character statistical inference.").

¶41 With that being said, even though the evidence was admitted in error, it was not prejudicial. "For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *State v. Miranda*, 2017 UT App 203, ¶ 44, 407 P.3d 1033 (quotation simplified).

¶42 We are not convinced that if the evidence of the trespassing incident had not been admitted, there was a sufficiently high likelihood of a different outcome at trial. The trial evidence came down to a test of credibility—Argueta's testimony against Victim's. We have little trouble concluding that the jury would likely have credited Victim's testimony over Argueta's—he testified that although he met Victim just once before, he stopped by her apartment in the early morning hours to claim an eighteen-month-old, twenty-dollar debt, and that when he saw the keys in the door, he decided to do a "good deed" by entering the apartment to place them inside. Further, some of Argueta's testimony was unclear and incohesive.[9]

---

9. For example, Argueta's testimony does not specify when Officer read him the *Miranda* rights, and his testimony on direct

(continued…)

Victim's version of events, on the other hand, remained consistent and was corroborated by other witnesses. Given Argueta's explanation regarding his presence in Victim's apartment and the strength of the other witnesses' testimonies, we cannot say the outcome of the trial likely would have changed had the court refused to admit the trespassing evidence. Accordingly, the district court's error in this regard does not require reversal. *See id.*

C.     The Peeping Incident

¶43     Argueta argues on appeal that the peeping incident was inadmissible under rule 403 of the Utah Rules of Evidence "because it was unreliable and unfairly prejudicial." Specifically, he contends the district court should have analyzed "the reliability of that identification under rule 403 before allowing it to be presented to the jury."

¶44     The State argues this issue is unpreserved, and we agree. "As a general rule, claims not raised before the district court may not be raised on appeal." *Oseguera v. State*, 2014 UT 31, ¶ 10, 332 P.3d 963 (quotation simplified). To preserve an issue for appeal, counsel must present the issue to the district court "in such a way that the court has an opportunity to rule on it." *Id.* (quotation simplified). An issue must be specific, raised in a

---

(…continued)

examination never mentions if Officer read him *Miranda* rights or told Argueta that he did not want to hear anymore from him. *See supra* ¶ 16. Also, when the prosecutor asked Argueta why he would drive approximately twenty-five minutes from his home to a bar in Salt Lake City, Argueta responded that he never said he drove from his home and that he usually stopped by the bar after running errands as a mechanic. But when the prosecutor asked him why he would be servicing vehicles around two o'clock in the morning, Argueta answered that was "not what [he] was doing exactly that day."

timely fashion, and identify supporting evidence or authority. *Id.* "[A] party that makes an objection based on one ground does not preserve any alternative grounds for objection for appeal." *Id.*

¶45 In his motion to suppress the prior-acts evidence, Argueta argued that evidence of the peeping incident was inadmissible under rule 403 because it would "greatly confuse the issues before the jury" and "cost a great deal of time and other resources." At the hearing, trial counsel mentioned that Victim's eyewitness identification was unreliable: "Every factor weighs against . . . a finding that this is a good eyewitness identification." But trial counsel asserted its unreliability would necessitate calling an expert witness—he did not argue that the unreliability of the identification would cause the evidence to be inadmissible under rule 403. Counsel's main concern was that calling an expert would require the parties to spend more time trying the uncharged peeping incident than the charged crimes.

¶46 Because counsel did not argue that unreliability was a basis for excluding the peeping incident under rule 403, he has failed to preserve the issue for appeal, and we decline to consider it.[10]

---

10. To seek review of an unpreserved issue, a party must articulate an exception to the preservation rule. *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 (articulating the three exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances). Argueta asks us to consider this claim under ineffective assistance of counsel and refers us to a particular section of his brief. But that section analyzes a different issue for ineffective assistance of counsel—whether Argueta's trial testimony triggered the introduction of the prior-acts evidence. We therefore do not consider the merits of this contention because Argueta failed to argue that any exception to the preservation rule applied here.

III. Ineffective Assistance of Counsel

¶47    Argueta makes three ineffective assistance of counsel claims on appeal. To demonstrate ineffective assistance, Argueta must show that trial counsel performed deficiently and that this deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is representation that "[falls] below an objective standard of reasonableness." *Id.* at 688. A defendant is prejudiced when "trial counsel's ineffective assistance harm[s] [the defendant] in a way that undermines our confidence in the verdict." *State v. Doutre*, 2014 UT App 192, ¶ 25, 335 P.3d 366. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *State v. McNeil*, 2013 UT App 134, ¶ 26, 302 P.3d 844 (quotation simplified), *aff'd*, 2016 UT 3, 365 P.3d 699; *accord Strickland*, 466 U.S. at 697.

¶48    First, Argueta asserts his counsel failed to object to evidence that, in 2014, an officer questioned him on the street. Argueta argues the evidence was previously undisclosed to the defense and otherwise inadmissible.

¶49    Assuming without deciding that the evidence was admitted in error, it was not prejudicial to Argueta's defense. The officer testified that Argueta was walking late at night in a neighborhood in which he did not live. The officer testified that Argueta stated he had to urinate frequently, and the officer told him he could not do that around the houses and if the officer caught Argueta exposing his penis the officer would arrest him. Although this evidence portrays Argueta in an unfavorable light, it does no more than demonstrate that Argueta was in a neighborhood other than his own late at night, and suggests that he may have urinated in public. Argueta had already testified that in Guatemala, his country of origin, it is acceptable to urinate outside as well as "in people's yards." This evidence was relatively mild compared to the evidence of sexual touching and the peeping incident. Furthermore, given Argueta's explanation

about why he was in Victim's apartment and the consistency in and corroboration of Victim's testimony, our confidence in the jury verdict is not undermined. Argueta was therefore not prejudiced by his counsel's failure to object to the admission of this evidence.

¶50 Next, Argueta argues trial counsel was ineffective for failing to renew the objection to the admission of the trespassing and peeping incidents on the basis that Argueta's testimony did not trigger the introduction of the rule 404(b) evidence.

¶51 During the pretrial hearing, the court determined that the trespassing and peeping incidents would be admissible if Argueta put "his intent of going inside of the apartment in play." Argueta argues that the triggering event was testimony that he had been given permission to enter the apartment. He argues that "[a]s long as [Argueta] did not claim that he had explicit permission from [Victim] to enter the apartment, none of the prior incidents should have been allowed in."

¶52 We read the record differently and determine that the triggering event was Argueta's testimony that he entered the apartment for a lawful or innocent purpose. When discussing this event at the hearing, the court referred to Argueta's potential testimony, stating, "I think where we have to go is to say, 'I had permission to go inside the house.'" But trial counsel explained that Argueta was never given permission to enter, and the prosecutor explained that the real issue would be whether Argueta would testify that he was there for "a lawful purpose" and was "being a good Samaritan" by putting the keys inside the apartment. After this dialogue, the court ruled that the triggering event would be if Argueta put "his intent of going inside of the apartment in play." We therefore determine that the triggering event was not testimony that Argueta had permission to enter the apartment, but testimony that he was there for a lawful purpose and innocently entered it.

¶53   At trial, Argueta's testimony during direct examination met this triggering event. He testified that he came to Victim's apartment to claim a twenty-dollar debt from her previous boyfriend—a lawful and legitimate purpose to stop by someone's residence. He also testified that he saw the keys in Victim's door and entered the apartment and placed them inside to do a "good deed"—an innocent explanation for entering. Because the triggering event for admitting the rule 404(b) evidence occurred, counsel did not perform deficiently by failing to renew an objection to the admissibility of the trespassing and peeping incidents based on the assertion that Argueta's testimony did not trigger their admission. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶54   Lastly, Argueta argues that trial counsel was ineffective for failing to move for a mistrial when the prosecutor "continued to make improper comments on [Argueta's] post-arrest silence." We have determined that the prosecutor did not comment on Argueta's silence, but instead drew attention to the statements he made to Officer after he was given a *Miranda* warning. *See supra* ¶¶ 20–29. Because the prosecutor's comments did not violate the rule articulated in *Doyle*, *see supra* ¶¶ 27–29, a motion for mistrial on those grounds would have been futile. Therefore, trial counsel did not perform deficiently by failing to move for a mistrial. *See Kelley*, 2000 UT 41, ¶ 26.

IV. Cumulative Error

¶55   Finally, Argueta argues we should reverse because the "cumulative effect of the errors was undoubtedly prejudicial." "Whether errors can be classified as cumulatively harmful turns on whether the errors undermine confidence in the jury verdict." *State v. Bradley*, 2002 UT App 348, ¶ 16, 57 P.3d 1139. Although we conclude it was error for the district court to admit evidence of the trespassing incident, we determined the error was harmless. And assuming, without deciding, that trial counsel should have objected to the evidence of Argueta's nighttime

conversation with the police, the cumulative effect of that conversation, even in conjunction with the admission of the trespassing incident, does not undermine our confidence in the jury verdict. Thus, we conclude there is no cumulative error.

CONCLUSION

¶56    We conclude the prosecutor did not violate Argueta's constitutional right to remain silent when she drew attention to statements he made to Officer after he was given a *Miranda* warning. We also conclude that though evidence of the trespassing incident was admitted in error, it was not prejudicial. Finally, we conclude Argueta did not preserve his arguments regarding the peeping incident, and his counsel did not render ineffective assistance. We therefore affirm.

———————