*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2020 UT 41**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

THE STATE OF UTAH,
*Respondent,*

*v.*

CARLOS WALTER ARGUETA,
*Petitioner.*

No. 20180814
Heard November 13, 2019
Filed July 2, 2020

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Mark S. Kouris
No. 151906605

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Solic. Gen., Sandi Johnson, Salt Lake City, for respondent

Teresa L. Welch, Nathalie S. Skibine, Salt Lake City, for petitioner

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE filed an opinion concurring in part
and concurring in the judgement,
in which JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1   Carlos Walter Argueta was caught in the middle of the
night in A.C.'s apartment. At the scene, she complained to a police
officer that Argueta had inappropriately touched her. That night,
also at the scene, and after invoking his *Miranda* rights, Argueta
refuted the allegation and offered a short, innocent explanation of

what had occurred. He was later charged with burglary and forcible sexual abuse. At trial, he elaborated upon his prior explanation, while A.C. and other witnesses offered testimony to the contrary. During the trial, the State introduced two prior bad acts that Argueta committed in an attempt to rebut his innocent explanation. At the end of a two-day trial, a jury convicted Argueta on both counts.

¶2 Argueta argues that the prosecutor's comments at trial about the differences between his initial statement at the scene and his trial testimony were a violation of his constitutional right to remain silent. He also argues against the admission of the two prior acts, claiming their admission prejudiced him.

¶3 We hold that any error found or assumed in this case was not prejudicial and, as a result, not reversible. In addition, we only address the issues that are preserved for appeal, and Argueta failed to preserve his argument that A.C.'s eyewitness testimony regarding an earlier encounter between them was so unreliable as to be inadmissible. We therefore affirm the judgment of the court of appeals and the conviction underlying it.

## BACKGROUND

¶4 On the night of June 6, 2015, A.C., her boyfriend (J.W.) and several of their neighbors were drinking and socializing in their next-door neighbors' backyard.[1] At some point between midnight and 2:00 a.m., A.C. decided to go to bed. She left the backyard by herself and went into her apartment. J.W. stayed outside a while longer.

¶5 A.C. and J.W. lived in a studio apartment in a house that had been converted into four separate units. Upon returning to her apartment, A.C. closed the apartment door. Because the apartment door locked automatically, she left her key in the door's lock, so J.W.—who did not have a key—could enter the apartment without waking her. She then undressed and got into her bed and under the covers. With the television on, she drifted into sleep. While she was "on the verge of getting to sleep," in "that place between deep sleep and still aware," A.C. felt someone "stroking" her vagina and

---

[1] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Griffin*, 2016 UT 33, ¶ 2 n.2, 384 P.3d 186 (citation omitted) (internal quotation marks omitted).

"rubbing" her buttocks. A.C. was facing a wall and her eyes were closed, so she could not see who touched her. She figured that it was J.W. It was not.

¶6   Some short but unknown time after A.C. went inside, J.W. decided to retire to bed too. He came back to the apartment and saw the door slightly ajar, with the key still in the lock. Once he looked inside, he saw A.C. asleep, but not covered, which was unusual for her. While he was still standing at the doorway, a man came running towards him from inside the apartment. Startled, J.W. stopped the man, and managed to hold him up against a dresser while he repeatedly shouted, looking for an explanation for the man's presence in the apartment.

¶7   The shouting awoke A.C. She saw that J.W. was holding a man, who turned out to be Argueta. At that time, she could not see his face clearly. She told J.W. that the man had touched her. J.W. told her to call the neighbors and wrestled the man into the house's hallway. A.C. followed them, finally saw Argueta, and punched him before running out to find the neighbors and call the police. Argueta kept apologizing and tried to escape. After he managed to get out of J.W.'s grip, two other neighbors arrived and helped J.W. pin him down on the house's front lawn until the police arrived and arrested him.

¶8   After a police officer read Argueta his *Miranda* rights and he invoked them, Argueta overheard A.C. telling the officer that Argueta had touched her. Argueta retorted that A.C. was "a liar, that he [had] met her at a bar, . . . that the keys [had been] left in the door, and that he had left the keys in the house."[2] The State charged Argueta with burglary and forcible sexual abuse.

¶9   At trial, Argueta presented a more elaborate version of the events of that night. He testified that he had met A.C. and J.H., her boyfriend at the time, at a bar close to A.C.'s apartment a year to a year-and-a-half before the incident.[3] They had talked and drunk until late. Before the bar closed, Argueta had offered J.H. a shot,

---

[2] There is some discrepancy in the record about whether Argueta made his statements before or after the police officer read him his *Miranda* rights. But the State and Argueta stipulated on appeal that Argueta made the statement after invoking *Miranda*. *State v. Argueta*, 2018 UT App 142, ¶ 8 n.2, 429 P.3d 764. We follow that stipulation here.

[3] In all relevant times to this case, A.C. lived in the same apartment.

which he had accepted and drunk. The couple had then asked Argueta to give them a ride home. He had agreed, and when they had gotten to their apartment, A.C. and J.H. had invited him in. J.H. had asked Argueta if he could borrow twenty dollars, and Argueta had given him the money. J.H. had told him, "[w]henever you want to come, I owe you $20."

¶10 Argueta testified that he had gone by the apartment "[f]ive or six times" to get the money back, usually in the early morning hours. But before the night of the charged act, he had "never attempted to enter the home because there were people in front, but [A.C. and J.H.] were not there."[4] On the night of the charged act, Argueta decided to enter the house, where he saw the apartment door open and the keys in the lock. He decided to enter the house and put the keys in the apartment as "a good deed." According to his testimony, as he put the keys onto the dresser and turned to leave, J.W. came into the apartment.

¶11 Before trial, the State sought to admit evidence of several prior bad acts allegedly committed by Argueta, under rule 404(b) of the Utah Rules of Evidence. After a hearing, the trial court found two of the prior bad acts admissible, but only to rebut any testimony by Argueta "as to his intent with regard to his entry, if any, into the [apartment]." The two prior bad acts were a 2010 incident in which Argueta was found trespassing near another woman's house and entered a plea in abeyance[5] (the trespassing incident) and a 2014 incident in which A.C. claimed she saw Argueta peeping into her apartment and confronted him (the peeping incident).

¶12 The jury convicted Argueta as charged and the court later sentenced him to two concurrent terms of one to fifteen years in prison. Argueta appealed, and the court of appeals affirmed his conviction. *State v. Argueta*, 2018 UT App 142, ¶ 56, 429 P.3d 764. Pertinent here, the court of appeals held that the prosecutor did not

---

[4] There is no testimony that Argueta knew that A.C. and J.H. separated, or that he knew that A.C. lived with J.W. at the time of the charged act.

[5] A plea in abeyance "means an order by a court, upon motion of the prosecution and the defendant, accepting a plea of guilty or of no contest from the defendant but not, at that time, entering judgment of conviction against him nor imposing sentence upon him on condition that he comply with specific conditions as set forth in a plea in abeyance agreement." UTAH CODE § 77-2a-1(1).

violate Argueta's right to remain silent when, during cross-examination and closing arguments, she commented on the omissions in his initial statement at the scene. *Id.* ¶¶ 27, 29. Additionally, the court of appeals held that the trial court erred in admitting the trespassing incident under the doctrine of chances, but that it was harmless error. *Id.* ¶¶ 40, 42. Finally, the court of appeals held that Argueta had failed to preserve his argument that the peeping incident should have been excluded from evidence since A.C.'s eyewitness testimony was unreliable.[6] *Id.* ¶ 46.

¶13 Argueta filed a certiorari petition on these three issues, which we granted. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶14 On certiorari, "we review the decision of the court of appeals and not that of the [trial] court." *State v. Hansen*, 2002 UT 125, ¶ 25, 63 P.3d 650 (citation omitted) (internal quotation marks omitted). And "we review the decision of the court of appeals for correctness." *Id.* (citation omitted) (internal quotation marks omitted). But "[t]he correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the trial court's decision under the appropriate standard of review." *State v. Apodaca*, 2019 UT 54, ¶ 25, 448 P.3d 1255 (citation omitted) (internal quotation marks omitted).

¶15 In this case, one issue—the alleged constitutional violation—should be reviewed for correctness. *State v. Hernandez*, 2011 UT 70, ¶ 3, 268 P.3d 822. The two other issues involve the trial court's decision to admit evidence, which we "will not overturn . . . absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981. "But whether the [trial] court applied the proper legal standard" in assessing the admissibility of that evidence is a question of law that we review for correctness." *Id.* (citation omitted) (internal quotation marks omitted).

## ANALYSIS

¶16 We granted certiorari on three questions. They are whether the court of appeals erred in concluding (1) that the cross-examination about omissions in Argueta's statement at the scene did not violate his right to remain silent, (2) that Argueta was

---

[6] Argueta made additional arguments on appeal, which were also rejected. *Argueta*, 2018 UT App 142, ¶¶ 47–55. He did not raise those arguments in his petition for writ of certiorari, and we therefore do not address them.

not prejudiced by the erroneous admission of the trespassing incident, and (3) that Argueta failed to preserve his challenge to the admission of the peeping incident.

¶17 Like the court of appeals, we find that Argueta failed to preserve his argument against the admission of the peeping incident. And we cannot determine whether the trial court erred in admitting the trespassing incident under the doctrine of chances due to lack of information as we explain below. But even if we assume error, it was harmless.

¶18 Finally, we do not determine if the prosecutor's comments about Argueta's omissions in his statement at the scene constitute a constitutional violation. That is because, even assuming that such a violation occurred, we find that it was harmless beyond a reasonable doubt and did not prejudice Argueta. Even without mentioning these omissions, the version that Argueta presented at trial cannot credibly stand when confronted with the versions offered by A.C. and the other prosecution witnesses, the circumstantial evidence, and the peeping incident.

¶19 We, therefore, affirm the court of appeals' judgment.

## I. PRIOR BAD ACTS EVIDENCE

¶20 In a pretrial ruling, the trial court held that the prior bad acts evidence—the peeping incident and the trespassing incident— would be admissible, but only "if . . . the defendant puts his intent of going inside of the apartment in play." Because Argueta's trial testimony did raise an issue about his intent in entering the apartment, both incidents were admitted into evidence.[7]

¶21 Argueta claims that admitting the evidence of the peeping and trespassing incidents was both erroneous and prejudicial. The court of appeals held that Argueta did not preserve his challenge to the peeping incident and that, although the trial court erred in admitting the trespassing incident, it was harmless error. *State v. Argueta*, 2018 UT App 142, ¶¶ 41, 46, 429 P.3d 764. We agree with the court of appeals' outcome and some of its analysis, as we explain below. We first address the challenge to the admissibility of the peeping incident and hold that it was not preserved. We then address the trespassing incident.

---

[7] Because Argueta's defense was that his intent of entering the apartment was innocent, Argueta's trial attorney asked him about the trespassing incident on direct examination, even before the State brought it up.

### A. The Peeping Incident

¶22 The peeping incident occurred in 2014. A.C. was laying in her backyard late one night when she saw a man peeping into the windows of her and her neighbor's apartments. She hid as she continued to watch the man. As the man moved away to the house next-door, A.C. ran into her apartment and alerted J.H. Together, the two confronted the man. The man was Argueta.[8] When the police arrived at the scene of the charged act at issue here, A.C. did not mention the peeping incident from 2014. But in her testimony, she said that once she saw Argueta in the lit hallway, she recognized him.

¶23 In his motion to suppress the evidence, Argueta argued that the peeping evidence "would greatly confuse the issues before the jury," and would require expert eyewitness testimony because of the "many problems inherent in eyewitness identification testimony." He submitted that the evidence is inadmissible under Rule 403 of the Utah Rules of Evidence because "the introduction and confrontation of the State's proposed 404(b) evidence would confuse the issues before the jury and cost a great deal of time and other resources, and [because] it is only tangentially related to the central issues of the State's allegations."

¶24 Argueta now claims that evidence of the peeping incident was inadmissible under rule 403 because A.C.'s eyewitness testimony was unreliable. But "[a]s a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. To preserve an issue for appeal, the "issue must be presented to the trial court" in a way that gives the trial court "an opportunity to rule on that issue." *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968. When evaluating if the trial court had such an opportunity, a court considers whether the party raised the issue timely and specifically and whether it introduced supporting evidence or relevant authority. *Winward v. State*, 2012 UT 85, ¶ 9, 293 P.3d 259. Importantly here, "if a party makes an objection at trial based on one ground, this objection does not preserve for appeal any

---

[8] Because we conclude that the challenge to the peeping incident admission was unpreserved, we do not outline the incident any further here. However, in our analysis below, we expand and detail the incident, as it relates to whether another assumed error in Argueta's trial was harmless beyond a reasonable doubt. *See infra* ¶¶ 61–65.

alternative grounds for objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867.

¶25 Argueta argued to the trial court that A.C.'s identification was inadmissible because "every factor weighs against a good [eyewitness] identification." But he never specifically argued that it should be inadmissible under rule 403 because it was unreliable. Instead, he argued that rule 403 blocked the eyewitness identification because of the burden that it would impose on the trial: it would "shift the jury's focus," and the court would "end up spending more time trying the [peeping incident]."

¶26 Argueta now asks us to read different parts of his argument at trial together, to form a timely, specific, and authority-supported argument for constitutional inadmissibility of the identification due to unreliability. We cannot bend our preservation requirements that far. Argueta's inadmissibility argument below did not hinge on the eyewitness testimony's unreliability but rather on its potential effect on the focus of the trial. The trial court did not understand Argueta's argument as an admissibility challenge based on eyewitness unreliability, but only as a challenge to the weight attributed to the testimony. At the end of the hearing, the trial court said that "there's an eyewitness issue there and we're going to allow an expert that the defense will bring in if they choose to." Argueta did not ask for a ruling on the admissibility argument he now claims he made, and his counsel even drafted the trial court's order, which also did not make any mention of this argument. The trial court thus had no "opportunity to rule" on whether evidence of the peeping incident was inadmissible under rule 403 because the eyewitness testimony was unreliable.

¶27 Argueta also asserts that the trial court ruled on the eyewitness identification issue, and therefore any objection that the issue has not been preserved for appeal is "conclusively over[come]." *Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (citation omitted). That ruling, according to Argueta, happened when the trial court remarked during a hearing that the "strength" of the identification evidence was "very thin." But Argueta attaches too much weight to this off-hand remark—a remark made while the trial court was posing "hypotheticals" in an attempt to understand the parties' arguments. Indeed, moments later the trial court judge said that he "obviously [didn't] know the facts." In any event, the trial court did not rule on the issue. And so this argument, too, fails.

¶28 For these reasons, we conclude that the court of appeals correctly held that Argueta failed to preserve his argument that evidence of the peeping incident was inadmissible under rule 403 because of eyewitness testimony unreliability. And thus we do not address whether the alleged unreliability of the eyewitness testimony makes the peeping incident inadmissible under rule 403.

*B. The Trespassing Incident*

¶29 The trespassing incident happened in 2010. The police found Argueta outside a home near A.C.'s apartment. The police had been called to that location because a woman had complained that someone was in her home. The police found the doors and windows locked and assured the woman that no one had entered her home. But the police found Argueta outside the home; he claimed he went near the house to urinate. He was later charged with trespassing and pled guilty in abeyance.

¶30 Argueta argues that the trial court erred in admitting evidence of the trespassing incident under the doctrine of chances and that the admission prejudiced him. The court of appeals agreed with Argueta that the admission was erroneous but held that it was not prejudicial. *Argueta*, 2018 UT App 142, ¶ 41. We agree with the court of appeals' outcome because we find that the admission of the trespassing incident was not prejudicial to Argueta. However, we cannot determine whether the trial court erred in admitting the trespassing incident under the doctrine of chances due to lack of information, as we explain below. We take this opportunity to further clarify the application of the doctrine of chances and the burden that the party seeking to admit evidence under the doctrine must meet.

¶31 Rule 404(b) of the Utah Rules of Evidence prohibits the admission into evidence of a "crime, wrong, or other act" to "prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." UTAH R. EVID. 404(b). It does, however, allow the admission of crimes, wrongs, and other acts for other non-propensity purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

¶32 To determine, under rule 404(b), whether prior bad acts are admissible to rebut, for example, defenses based on mistake or lack of intent, courts apply the doctrine of chances. *State v. Lowther*, 2017 UT 34, ¶ 23, 398 P.3d 1032. The doctrine of chances is an analytical framework that "rests on the objective improbability of the same rare misfortune befalling one individual over and over." *State v.*

*Verde,* 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, ¶ 53, 391 P.3d 1016 (citation omitted). A proper use of the doctrine assists to discern whether the inference from the prior bad act is permissible or not. *See id.* ¶ 51.

¶33 In *Verde*, we laid out some criteria for the application of the doctrine of chances. There we also acknowledged the difficult and sensitive nature of the doctrine's inquiry. *Id.*; *id.* ¶¶ 55, 57–61. Recent case law and law review publications have highlighted the difficulty of the doctrine's application in different circumstances. *See, e.g., State v. Lane*, 2019 UT App 86, ¶¶ 36–50, 444 P.3d 553 (Harris, J., concurring); *State v. Murphy*, 2019 UT App 64, ¶¶ 45–65, 441 P.3d 787 (Harris, J., concurring); Edward J. Imwinkelried, *Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances as a Justification for Introducing Uncharged Misconduct Evidence to Prove Intent*, 45 HOFSTRA L. REV. 851 (2017). The concerns raised in the court of appeals' case law and law review publications merit careful consideration. We therefore recently charged our advisory committee on the Utah Rules of Evidence to propose recommendations to address this issue. We will also continue clarifying the doctrine's application in our case law, as relevant issues come up, as we do here.

¶34 One such needed clarification concerns the articulation of the "rare misfortune" that triggers the doctrine's application. "[C]are and precision are necessary to distinguish permissible and impermissible uses of evidence of prior bad acts, and to limit the factfinder's use of the evidence to the uses allowed by rule." *Verde*, 2012 UT 60, ¶ 55. The care and precision begin with the party seeking to admit a prior bad act under the doctrine of chances. This party must articulate the "rare misfortune" that triggers the doctrine's application. Without a clear articulation of what event is being evaluated it is difficult to make sure that a prior bad act is admissible under the doctrine for a permissible inference.

¶35 "[F]or evidence to be admitted under the doctrine of chances, it must meet four foundational requirements: materiality, similarity, independence, and frequency." *State v. Lopez*, 2018 UT 5, ¶ 54, 417 P.3d 116. When a trial court is confronted with evidence that the State intends to admit under the doctrine of chances, it must assess these foundational requirements to decide its admissibility.[9] *Id.* It cannot simply rely on the similarity between

---

[9] Such assessment is only the first step to admission of evidence. Even if evidence is admitted under the doctrine of chances, the

(continued . . .)

the charged act and the prior bad acts. *See* Imwinkelried, 45 HOFSTRA L. REV. at 856–857, 872.

¶36 The court of appeals held that two of the foundational requirements for the doctrine's application—similarity and frequency—were not met.[10] *Argueta*, 2018 UT App 142, ¶¶ 38–39. Because the State has not properly articulated what "rare misfortune" is examined here, we cannot fully agree with the court of appeals, as we explain below.

¶37 "Similarity and frequency are both important inputs for determining [objective] improbability; the less similar the acts, the more probable it is that they would occur in the general population. And the less frequently they occur in the general population, the more it is objective[ly] improbabl[e] that so many incidents would occur randomly." *Lopez*, 2018 UT 5, ¶ 59 n.12 (alterations in original) (citation omitted) (internal quotation marks omitted). Similarity and frequency, therefore, "interact with each other to become a safeguard against the doctrine of chances becoming a work-around for the admission of otherwise improper propensity evidence." *Id.* ¶ 57. To evaluate them both, it is important to articulate the improbable "rare misfortune."

¶38 To satisfy the foundational requirement of similarity, the similarity of the past act need not be "as great as that necessary to prove identity under a 'pattern' theory," but it still needs to be significant enough to "suggest a decreased likelihood of coincidence." *Verde*, 2012 UT 60, ¶ 58. It must be "sufficient to dispel any realistic possibility of independent invention." *Id.* ¶ 59 (quoting Mark Cammack, *Using the Doctrine of Chances to Prove* Actus reus *in Child Abuse and Acquaintance Rape*: People v. Ewoldt *Reconsidered*, 29 U.C. DAVIS L. REV. 355, 405–06 (1996)) (internal quotation marks omitted); *see also Lowther*, 2017 UT 34, ¶ 36.

---

court must "proceed to assess the evidence under rules 402 and 403." *State v. Lowther*, 2017 UT 34, ¶ 32. Because the evidence here does not survive the rule 404(b) inquiry, we need not go any further.

[10] The court of appeals found that these two requirements were not met and did not address the other factors: materiality and independence. *Argueta*, 2018 UT App 142, ¶ 35. The court of appeals did not need to address the two other requirements. Because the State needs to meet *all* requirements, finding that it had not met even one of the requirements means that the State failed to meet its burden under the doctrine.

¶39 Under the frequency requirement, the defendant "must have been accused of the crime or suffered an unusual loss more frequently than the typical person endures such losses accidentally. It is this infrequency that justifies the probability analysis underlying the doctrine of chances." *Verde*, 2012 UT 60, ¶ 61 (emphasis omitted) (citation omitted) (internal quotation marks omitted). The number of incidents carries weight in the analysis of frequency. But the number of occurrences and their temporal proximity are usually not enough to establish the frequency requirement. The assessment of frequency cannot be based solely on intuition. To evaluate the frequency of a "rare misfortune," a court must ascertain some benchmark for the "typical person['s]" endurance of the crime or unusual loss through testimony or judicial notice. *See Lane*, 2019 UT App 86, ¶ 49 (Harris, J., concurring). Without such a benchmark, the frequency requirement in *Verde* is only empty words.

¶40 With respect to the similarity prong, here, the State has not clearly articulated what "rare misfortune" the trespassing incident evinces. At the trial court hearing, the State argued that "part of [the trespassing incident], kind of falls under th[e] doctrine of chances," because Argueta's "MO" is to "go[] inside to commit the assault." We cannot discern what improbable event the State is highlighting with this statement. It could be "being discovered on a young woman's property in the early hours of the morning," "being discovered inside a young woman's house," or perhaps "having to urinate near or at a young woman's house at the early hours of the morning." It could be all these misfortunes or a different one altogether.

¶41 And because the State has not presented such a clear "rare misfortune" to the trial court, the court of appeals, or us, we cannot properly evaluate the foundational similarity requirement. It would be futile to point to the dissimilarities between the trespassing incident and the case at hand because some may not be relevant to the similarity assessment, given the rare misfortune we evaluate.

¶42 For a similar reason, it is unhelpful to analyze the frequency question here either. The State made no effort to establish a benchmark for a "typical person," even if we could identify what "rare misfortune" we were assessing. The State did, however, question Argueta's innocent urination explanation at trial. The State asked Argueta questions about his repeated urination in public. Even if we assume that this questioning is related to the not-clearly-articulated "rare misfortune," it would

not help the State's argument. That line of questioning only showed that Argueta was repeatedly caught urinating in public on occasions and locations unrelated to young women's properties. It therefore strengthens Argueta's innocent explanation that he urinated publicly whenever he had the need to do so, and does not necessarily make it improbable that sometimes it would be by or on a young woman's property.

¶43 While we agree with the court of appeals' intuition that "[o]ne trespassing conviction does not increase the statistical likelihood that on a different occasion Argueta entered [A.C.'s] apartment with unlawful intent," *Argueta*, 2018 UT App 142, ¶ 40, we cannot affirm it due to the lack of information before us, as we explain above.

¶44 But even if we assume error, "[f]or an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). "The burden of showing harmfulness normally rests with the complaining party." *State v. Robertson*, 932 P.2d 1219, 1227 (Utah 1997), *overruled on other grounds by State v. Weeks*, 2002 UT 98, ¶ 25 n.11, 61 P.3d 1000.

¶45 Below, we find that the State has shown that another alleged error in Argueta's trial was harmless beyond a reasonable doubt. *See infra* ¶¶ 57–73. Given that analysis and specifically, the overwhelming evidence presented against Argueta, even without the trespassing incident, we do not find the inclusion of the trespassing incident probative to the case. We, therefore, agree with the court of appeals that even assuming error, it was harmless and not reversible.

## II. THE PROSECUTION'S COMMENTS ABOUT ARGUETA'S STATEMENTS WERE HARMLESS BEYOND A REASONBLE DOUBT

¶46 Argueta's chief complaint is about the prosecutor's comments during cross-examination and closing arguments regarding the differences between Argueta's initial explanation to the police and his trial testimony.

¶47 At the scene of the charged act, and after Argueta invoked his *Miranda* rights, Argueta spontaneously told a version of what happened. As he later recounted it, he told the police officer that A.C. was "lying[] because [he] knew her at the bar," and that he found the apartment keys in the door, and "left the keys in the apartment." At trial, Argueta *elaborated* on this version. He *added details* about meeting A.C. at the bar and also testified that A.C. and

J.H. previously invited him into the apartment and that they owed him money, which he had come to collect on the night of the charged act. During Argueta's cross-examination, the prosecutor referred several times to the omissions in the initial statement at the scene compared to the version Argueta presented in his testimony. She also addressed these omissions in her closing arguments, pointing out that Argueta had not told the officer in which bar he had met A.C. or that J.H. owed Argueta twenty dollars.

¶48 Argueta argues that these comments violated his right to remain silent under *Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."). In response, the State argues that the prosecutor did not comment on Argueta's silence, but rather about the inconsistencies between his two versions of events and that the United States Supreme Court has held that these types of comments do not violate the right to remain silent. *Anderson v. Charles*, 447 U.S. 404, 409 (1980) ("We conclude that *Doyle* does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case.").

¶49 Other jurisdictions have taken varied positions on where comments similar in nature "fall" within the spectrum between *Doyle* and *Charles*, as both parties aptly argue. Because we find no prejudice here, *see infra* ¶ 73, we decline to determinatively decide this question, and leave it for a future appropriate case.[11]

¶50 The concurrence would prefer us to decide the question. The concurrence recognizes that "the lack of prejudice is a sufficient basis for disposition of this case." *Infra* ¶ 76. But it argues that it is an important question that we granted certiorari on and that it already has "a clear answer in controlling precedent," *infra* ¶ 76 n.23, found in *State v. Velarde*, 675 P.2d 1194 (Utah 1984), which the

---

[11] Our decision to not decide the matter should not be viewed as an implicit endorsement of the court of appeals' determination that there is "no difference in impeaching a defendant's prior inconsistent statement and impeaching a prior statement that omitted exculpatory details where a defendant has not been induced to remain silent." *Argueta*, 2018 UT App 142, ¶ 29 (citation omitted) (internal quotation marks omitted).

concurrence claims we are "casting shade on" by not deciding the constitutional question, *infra* ¶ 83.

¶51 Unlike the concurrence we do not think that *Velarde* "clear[ly]" answers the question presented here. *Infra* ¶ 111. Indeed, read properly, we do not think it answers it at all. *Velarde* is about the theft of a truck. The defendant in *Velarde* was found asleep in the stolen truck in Morgan, Utah. 675 P.2d at 1195. Upon being roused by a police officer, "and without any prompting," he assumed the "search" position against the truck. *Id.* Unlike Argueta, he never invoked his right to remain silent after being given his *Miranda* warnings. *See id.* Instead he freely told the officer that arrested him that he did not own the truck and that he had no idea he was in Morgan. *Id.* Then, at trial, he testified altogether differently that someone with a truck picked him up and they drove together to Morgan, where that person lived. *Id.*

¶52 This court rejected Velarde's argument that the prosecutor's cross-examination about his inconsistent versions was a commentary on his "silence." *Id.* at 1195. We explained that "inconsistency" in testimony "is a legitimate basis for a prosecutor's testing the credibility of a witness by way of impeachment," *id.*, because "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements," *id.* at 1196 (quoting *Charles*, 447 U.S. at 408).

¶53 The concurrence asserts that Velarde's two versions are reconcilable, and even though the *Velarde* court characterized them as "inconsistent," it nevertheless resolved the question before us, involving Argueta's reconcilable versions. *Infra* ¶¶ 111, 111 n.26. We do not think that the concurrence's interpretation of *Velarde* is plausible or ascertainable from that less-than-two-page opinion. If we would have found this interpretation somewhat persuasive, there would be no need for a concurrence.

¶54 *Velarde*, therefore, tells us little to nothing about cases like Argueta's, where a defendant's versions are not inconsistent, but merely supplemental and reconcilable.[12] And our one case that has relied on *Velarde* since its issuance mentioned in parentheses that *Velarde* stands for the unremarkable proposition "that defendant's

---

[12] Even though the key words in this debate, "supplemental," "different," or "reconcilable" do not appear in *Velarde* in any form, the concurrence characterizes the decision as displaying a "straightforward conclusion" with a "square holding." *Infra* ¶¶ 82, 111 n.26.

inconsistent testimony is legitimate basis for prosecutor's questioning his credibility." *Alta Pac. Assocs., Ltd. v. Utah State Tax Comm'n*, 931 P.2d 103, 110 (Utah 1997) (Russon, J., plurality opinion).[13]

¶55 That is why, for us, answering the constitutional question the parties spar about is a task that would require a venture into murky waters. Under these circumstances, resolving the constitutional question would go against our approach to judging. "In light of the 'great gravity and delicacy' of constitutional questions, . . . '[t]he Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.'" *State v. Rowan*, 2017 UT 88, ¶ 25, 416 P.3d 566 (Himonas, J., concurring) (second alternation in original) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 345–46 (1936) (Brandeis, J., concurring)). We have gone so far in the past as to assert that it is "our obligation to avoid addressing constitutional issues unless required to do so." *Gardner v. State*, 2010 UT 46, ¶ 93, 234 P.3d 1115 (citation omitted) (internal quotation marks omitted); *see also State v. Wood*, 648 P.2d 71, 82 (Utah 1982) ("[W]e address neither the federal nor the state constitutional issues because the case can be decided on the preferred grounds of statutory construction. It is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so.").[14] And although we granted certiorari on the constitutional question, we did so, as we do in other instances, bearing in mind that it is possible we will not reach the issue. *See, e.g., State v. Ray*, 2020 UT 12, ¶ 45, --- P.3d --- (acknowledging that we granted certiorari on whether the court of appeals erred in its determination that Ray was prejudiced by any

---

[13] We also note that *Alta Pacific* was not a criminal case, and its use of *Velarde* was as an example for the proposition that "inconsistencies within one party's appraisal could support the approval of a competing and more consistent appraisal." *Alta Pac. Assocs.*, 931 P.2d at 110 (Russon, J., plurality opinion).

[14] It may be that these prior cases overstated the principle of constitutional avoidance by speaking broadly in terms of "obligation[s]" and "fundamental rule[s]." If so, it would be prudent for us to revisit this language. But we should do so with the able assistance of counsel and cautiously. For "[w]hen a practice of restraint is durable—when it has survived several turns of the wheel—a wise humility counsels against discarding it." *Rowen*, 2017 UT 88, ¶ 27 (Himonas, J., concurring).

deficient performance, but ultimately deciding to "not address the prejudice prong," because we concluded the counsel performance in question "was not deficient").

¶56 We can proceed, therefore, under the assumption that the prosecutor's comments did rise to a *Doyle* violation. Because even assuming such violation, we hold it did not prejudice Argueta, as the State has shown that any such violation was harmless beyond a reasonable doubt. *See Brecht v. Abrahamson*, 507 U.S. 619, 629–30 (1993) (requiring a conviction involving a federal constitutional error to be set aside unless it is harmless beyond a reasonable doubt).

¶57 To avoid reversal on account of a *Doyle* violation, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt. The State bears the burden of proving that an error passes muster under this standard." *Id.* at 630 (citation omitted) (internal quotation marks omitted).

¶58 In *State v. Tillman*, we held that a violation similar to the one alleged here was harmless beyond a reasonable doubt "[i]n the face of overwhelming evidence of defendant's guilt, together with the fact that the comments were isolated as opposed to extensive and the fact that the trial judge specifically instructed the jury that no presumption adverse to [the defendant] is to arise from" his silence. 750 P.2d 546, 555 (Utah 1987) (citations omitted) (internal quotation marks omitted). These principles guide us in our decision today, but they are not factors in a rigid examination.[15] The weight of each consideration and the possible availability of other

_____

[15] After our decision in *State v. Tillman*, 750 P.2d 546 (Utah 1987), the court of appeals "codified" our statement into four factors. *See, e.g., State v. McCallie*, 2016 UT App 4, ¶ 28, 369 P.3d 103; *State v. Byrd*, 937 P.2d 532, 535 (Utah Ct. App. 1997); *State v. Reyes*, 861 P.2d 1055, 1057 (Utah Ct. App. 1993). The parties and the court of appeals refer to them as the "*Byrd* factors" (even though they were first codified in *Reyes*). *See, e.g., McCallie*, 2016 UT App 4, ¶ 38.

We read our decision in *Tillman* differently. It merely offered specific reasons why there was no prejudice in that case based on past precedents of this court and the United States Supreme Court. It did not offer mandatory, rigid factors. While we endorse the rationale behind the "factors" identified by the court of appeals, as we did in *Tillman*, we discourage courts from over-relying on them. They should instead conduct a more holistic, case-by-case prejudice inquiry.

considerations change from case to case. Courts thus should not view *Tillman*'s considerations as set in stone.

¶59 Here, we find that the overwhelming evidence of Argueta's guilt as manifested in the trial testimony is more than sufficient to find that any alleged *Doyle* violation was harmless beyond a reasonable doubt.

¶60 Argueta's testimony at trial had two prongs: first, his reason for being at the apartment at all—coming to collect on J.H.'s twenty-dollar debt; and second, his reason for entering the apartment—to do a "good deed" by placing the keys inside. Neither prong is credible in light of the rest of the evidence, as well as in light of Argueta's testimony.

¶61 First, Argueta testified that in 2014, a year and a half before the charged act, he had met A.C. and J.H. at a bar. He had conversed and drunk with them—on their initiative. When the bar had been about to close, he had offered J.H. a shot, before telling them that he had to leave. A.C. and J.H. had asked him for a ride to their apartment, and he had obliged. He then testified that the couple had invited him inside for a drink, which he had agreed to. At their apartment, J.H. had asked if he could borrow twenty dollars from Argueta. Argueta had given J.H. the money. He had then decided to leave the apartment, and J.H. had told him, "[w]henever you want to come, I owe you $20." Argueta mentioned several times that the couple had argued with each other throughout the night.

¶62 Argueta testified that had he attempted to collect his debt "[f]ive or six times." He had usually done so late at night after the bars had closed. He would drive by the house, but because "there were people in front, but [A.C. and J.H.] were not there," he had never attempted to enter the house. Trying to corroborate this story, Argueta pointed to the fact that J.H. had told a private detective Argueta hired that he had previously met Argueta "in passing."

¶63 In contrast, J.H. testified that in April 2014, he had been on the front porch of A.C.'s apartment and that Argueta had walked by with a bottle of Tequila and offered him a shot. He had accepted. The two had drunk together and "made small talk for maybe a minute or so." J.H. had gone back inside, and thirty minutes later he had heard A.C. yelling that there was someone outside peeking through their apartment window and asking J.H. to "stop this guy." He had gone outside and found Argueta at the side of the house. When he and A.C. had confronted Argueta, he had acted

friendly and assured them that "he was just looking for a place to piss." J.H. also explained that he had said he had met Argueta "in passing" only because he had met him during the peeping incident. He testified further that he had never asked anyone for a ride from the bar in question because he lived "close enough" to "walk every time."

¶64 A.C.'s version of the events was consistent with J.H.'s. She testified that she and J.H. had argued the night of the peeping incident as they came back from a bar, and that they both had gone outside of the small apartment to cool down. She had been in the backyard, lying on the ground when she had noticed a stocky man, dressed in black, peeping into her window. She had hidden behind a truck as she watched him continue to peep into her and her neighbor's apartments. When the man had moved to the house next door, she had run into the house and alerted J.H. After that, J.H. had gone to the side of the house and found Argueta. He had come back with his "arm around [Argueta]." J.H. explained that "[Argueta] [had] walked by the house earlier and offered [him] a shot." When A.C. and J.H. had confronted Argueta and asked what he was doing, he had replied that he had had to pee and denied looking through the window.

¶65 Argueta's testimony and that of A.C. and J.H. had striking similarities. Both the peeping incident and Argueta's bar story took place during approximately the same time. In both stories, A.C. and J.H. came back late at night from a bar and were fighting, and Argueta offered J.H. a shot, and they drank it together.[16] The combination of J.H.'s testimony contradicting Argueta's version, the consistency between J.H's and A.C.'s testimonies, and the suspicious amount of similarities between the two stories, given that Argueta was familiar with J.H.'s version of the events,[17] impedes the credibility of Argueta's trial testimony background prong.

¶66 In the second prong of his testimony, Argueta offered an innocent explanation for his presence at A.C.'s apartment on the

---

[16] Relevant here is that Argueta heard part of A.C.'s peeping incident testimony and its description by the prosecutor at the preliminary hearing he attended, well before he testified about his version of events.

[17] At the very least, Argueta's trial attorney learned of J.H.'s version of events two days before trial, when J.H. told the entire version to Argueta's private investigator.

night of the charged act. This prong was also not credible considering its absurdity, as well as the inconsistencies as to specific details between Argueta's version and that of other witnesses—whether the door to the apartment was open, whether the keys were inside the lock when J.W. came back to the apartment, and whether A.C. was sleeping covered or uncovered.

¶67 Argueta's explanation of what happened on the night of the charged act, even taken at face value, was absurd and not believable. As the court of appeals eloquently stated, Argueta "testified that although he [had] met [A.C.] just once before, he stopped by her apartment in the early morning hours to claim an eighteen-month-old, twenty-dollar debt, and that when he saw the keys in the door, he decided to do a 'good deed' by entering the apartment to place them inside." *Argueta*, 2018 UT App 142, ¶ 42. Then, when J.W. came into the apartment, Argueta tried to run out of the apartment instead of explaining that he was simply doing a "good deed."[18]

¶68 Beside the absurdity, Argueta's story details did not add up. He testified that when he approached the apartment's door that night, it was "already open" and that the keys were in the lock. According to him, he wanted to do a "[g]ood deed" by putting the keys in the apartment and leaving.

¶69 But this version contradicts other testimony. A.C. testified that she had left the key in the door and closed the door all the way. Seeing the open door when he got back to the apartment, J.W. thought it was unusual.[19] He testified that "[w]hen [A.C.] went in she said that she would leave the keys in the door for me so that I could get in because we have . . . one of the automatic locks. So she left the keys in the door, and . . . I don't know why she would leave the keys in the door and leave it open so it wouldn't lock."

¶70 Argueta also testified that he took the keys out of the door and put them on the dresser, and that as he was "turning back, [J.W.] was in front of" him. But J.W. testified he remembered the keys were still in the lock when he arrived at the apartment and

---

[18] Argueta testified that he tried to explain himself but J.W. did not let him. But this attempt did not explain why he tried to run out of the apartment as he saw J.W. instead of explaining his presence right then.

[19] The door could have been open either before Argueta arrived or because he opened it.

that "a figure . . . just kind of full rushing me . . . just from thin air, [came] running . . . trying to get out the door."

¶71 Additionally, Argueta's testimony on whether A.C. was covered or uncovered while asleep does not make sense given the other testimony. Argueta testified that when he entered the apartment he saw "a bulk" on A.C.'s bed, and it "was like the bed was covered." This was consistent with A.C.'s testimony that she covered herself up when she went to bed. It was also consistent with J.W.'s testimony that A.C. always slept covered with at least a sheet. But when J.W. came into the apartment he immediately noticed that A.C. was not covered and "the blankets were down" and were "move[d] . . . kind of off of her." Argueta did not address this statement. Only one person other than A.C., who was at least partially asleep, could have removed the blankets. That was Argueta.[20]

¶72 Even taken at face value, without considering Argueta's initial statement at all, his trial testimony version did not hold up against the overwhelming evidence against him. In addition, the jury heard testimony about the peeping incident and could have concluded from that testimony that, because Argueta had tried to

---

[20] Argueta's testimony at trial had additional discrepancies. He was shifting about what he was doing the night of the charged act in general. On cross-examination, he testified that he had worked for "the garbage collecting company in Orem" at that time. But then he said that he had been a "mechanic… [a]nywhere" and would find himself in the area because he was "running some other errands." But when the prosecutor asked him what errands he had been running on the night of the charged act, he answered "[t]hat's not what [he] was doing exactly that day." *See also Argueta*, 2018 UT App 142, ¶ 42 n.9 (internal quotation marks omitted).

Argueta was also inconsistent in his explanation of why he chose to enter the apartment that night and not on other occasions. He testified that had he attempted to collect the alleged debt from A.C. and J.H. unsuccessfully "five or six" times but never "attempted to enter the home" because they were not among the people out front. On the night of the charged act, he had finally decided to go into the house to collect his debt. However, from his description, this night was not any different from other nights he had tried to collect the debt. He did not see A.C. or J.H. in front of the house but he saw "some people . . . in the back of the house," and thought, "maybe they are in now."

peep on A.C. before, there was a non-innocent intent for his actions on the night of the charged act.

¶73 In sum, there was overwhelming evidence of Argueta's guilt given the other trial testimony. Therefore, even if we assume that the prosecutor's comments violated *Doyle*,[21] that violation was harmless beyond a reasonable doubt.[22]

## CONCLUSION

¶74 Argueta failed to preserve his challenge to the admissibility of the peeping incident. Additionally, all alleged errors in his trial, even assuming they all occurred, were not prejudicial to him under our relevant standards. Therefore, we affirm the court of appeals judgment and Argueta's convictions.

––––––––––––

[21] The parties dispute whether the comments were a meaningful part of the cross-examination and the closing arguments. Each party refers to the extent of the comments compared to the length of the cross-examination and closing arguments. They do so because *Byrd* stated that whether "the reference was isolated" is a relevant factor in the analysis of harmlessness beyond a reasonable doubt. 937 P.2d at 535. That factor originated in our *Tillman* opinion, which said that whether "the comments were isolated as opposed to extensive" mattered for the analysis. 750 P.2d at 555. This is a good example as to why the "*Byrd* factors" do not serve their purpose. An arithmetic calculation of words and lines alone gives us no dispositive finding on the effect that the prosecutor's words had on the jury. At times, even one word can echo with a listener. Our main inquiry is the strength of the case against the defendant. And here, the extent of the comments is irrelevant given the overwhelming evidence of Argueta's guilt and his unbelievable version of events.

[22] In section I.B. we explain that because the State has shown harmlessness beyond a reasonable doubt regarding the alleged *Doyle* violation, we hold that Argueta could not show that the admission of the trespassing evidence was harmful. The overwhelming evidence against Argueta leaves no room to assume that the trespassing incident was probative in the jury determination.

Lee, A.C.J., concurring in part and concurring in the judgment

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶75 I concur in the judgment of the court and in most of the majority opinion. I applaud the court's refinement and clarification of the doctrine of chances. And I agree with its conclusion that no prejudice resulted from either of the errors alleged by Argueta— (a) the prosecutor's questions and comments about differences between Argueta's statements at the scene of the crime and his testimony at trial (allegedly in violation of Argueta's Fifth Amendment rights), and (b) the admission of Argueta's prior trespassing conviction (purportedly in contravention of our rules of evidence under the doctrine of chances).

¶76 Normally I would agree that the lack of prejudice is a sufficient basis for disposition of this case. But the fact-intensive prejudice inquiry is not the reason we granted certiorari. We granted certiorari to consider whether the court of appeals erred in concluding that Argueta's Fifth Amendment rights were not violated when the prosecutor sought to impeach his credibility by highlighting "exculpatory details" that Argueta mentioned at trial but omitted in earlier statements to police. This is an important question. And we should address it because it has a straightforward answer in controlling precedent of the United States Supreme Court and in a governing decision of this court.[23]

¶77 The court of appeals based its conclusion on the United States Supreme Court's decision in *Anderson v. Charles*, 447 U.S. 404 (1980), which endorsed cross-examination that highlights inconsistencies between a defendant's trial testimony and prior voluntary statements to police. That case held that in such circumstances, there is no Fifth Amendment violation under *Doyle v. Ohio*, 426 U.S. 610 (1976) because the prosecution is not commenting on a defendant's *silence* (his failure to speak to police) but rather his *statements* to police. *Charles*, 447 U.S. at 408–09.

¶78 Argueta has challenged that determination on certiorari. He claims that his Fifth Amendment rights were infringed under *Doyle* because the prosecutor's cross-examination drew "negative inferences" from his "silence," not his "inconsistent statements."

---

[23] I am not suggesting that we must address any issue on which we grant certiorari. I am asserting that the question we agreed to hear is important to resolve—because it finds a clear answer in controlling precedent and declining to answer it will unsettle our law unnecessarily. *See infra* ¶¶ 80–82, 84, 106.

Lee, A.C.J., concurring in part and concurring in the judgment

Argueta thus views *Charles* as governing only the limited circumstance in which the defendant is cross-examined about statements that are irreconcilable. In Argueta's view, "*Charles* is inapplicable to this case because Argueta's [trial] testimony provided only additional details, not inconsistent statements, when comparing Argueta's trial testimony to his post-arrest statements to police."

¶79 The State disagrees. It asserts that details given at trial but omitted in earlier statements to police are a kind of "inconsistency," and that any cross-examination focusing on such statements is fair game under *Charles*. It also contends that we already resolved this question in *State v. Velarde*, where we explained that *Doyle* has "no application to a case in which the defendant did *not* exercise his right to remain silent," and emphasized that there is no Fifth Amendment bar on "cross-examination that merely inquires into [voluntary] prior inconsistent statements." 675 P.2d 1194, 1196 (Utah 1984) (citations omitted). The State contends that this is precisely the situation here since Argueta did not exercise his right to remain silent but instead spoke freely and voluntarily to the police. Because the prosecutor did not use Argueta's "*silence . . .* to impeach an explanation subsequently offered at trial," *Doyle*, 426 U.S. at 618 (emphasis added), but rather highlighted differences between his prior voluntary statements and trial testimony (embellishments added at trial), the State asks us to affirm the court of appeals under the standards set forth in *Doyle*, *Charles*, and *Velarde*.

¶80 I agree with the State's reading of these cases. In the paragraphs below, I show that these decisions hold that there is no constitutional bar on a prosecutor's comments highlighting *inconsistencies* between a story told voluntarily in a pretrial investigation and a story told voluntarily at trial. I then establish that there is no constitutional or logically tenable distinction between the *inconsistency* of (a) telling one story to police and a directly contradictory one at trial and (b) telling a limited story to police and embellishing it at trial. In neither circumstance has the defendant exercised his "right to remain silent." He has voluntarily spoken at two different stages of the process—in a police investigation and at trial. And in so doing he has voluntarily subjected himself to cross-examination, without any infringement of any right guaranteed by the Fifth Amendment or United States Supreme Court precedent. The circumstance at issue here (embellishment) is precisely the circumstance at issue in *Velarde*—the defendant's two voluntary stories were not directly

Lee, A.C.J., concurring in part and concurring in the judgment

contradictory, but inconsistent only in the sense that one added detail not previously provided. *See infra* ¶¶ 111, 111 n.26. In that situation, the *Velarde* court held that an "inconsistency" in a defendant's stories "is a legitimate basis for a prosecutor's testing the credibility of a witness by way of impeachment." 675 P.2d at 1195. And it affirmed a conviction against a constitutional claim that such a move ran afoul of the defendant's "right to remain silent." *Id.* (citation omitted).

¶81 I find this holding controlling for reasons explained in greater detail below. The majority disagrees, asserting that *Velarde* does not "'clear[ly]' answer[] the question presented here." *Supra* ¶ 51. Yet it does so in an opinion that offers no salient basis for rejecting my reading of *Velarde* or for effectively distinguishing it—and that simultaneously purports to be avoiding the constitutional question altogether. *See supra* ¶ 49 (stating that the court is "declin[ing]" to decide the constitutional question); *supra* ¶¶ 55, 55 n.14 (asserting that a decision on "the constitutional question would go against our approach to judging" under the doctrine of "constitutional avoidance").

¶82 The most the majority can say about *Velarde* is that it involved an "inconsistency" in which the defendant gave one version of his story prior to trial and a "different[]" version at trial. *See supra* ¶¶ 51–52. But that just underscores the parallelism between this case and *Velarde*. As in this case, the *Velarde* defendant's stories did not directly contradict each other—they were "inconsistent" only in the sense that the defendant embellished his story at trial. *See infra* ¶¶ 111, 111 n.26. It was in that context that the *Velarde* opinion held that "in order to assert the [*Doyle*] privilege[,] there must be an initial *and sustained* silence after the *Miranda* warning is given." *Velarde*, 675 P.2d at 1196 (emphasis added). That holding should control our decision here. We should not be waving it off on the ground that the opinion is somehow "unremarkable" and has been cited only once in our case law. *See supra* ¶ 54. That is not a basis for overriding a square holding of this court under our doctrine of *stare decisis*. And even if the *facts* of *Velarde* were "[un]ascertainable" because the opinion is less than two pages long, *see supra* ¶ 53, (they aren't, *see infra* ¶¶ 111, 111 n.26), this clear holding about the actions a defendant must take before invoking *Doyle* would still control. The court is thus in no position to claim that its decision to dismiss *Velarde* is an act of constitutional avoidance. *See supra* ¶ 55.

¶83 Constitutional avoidance makes sense when we are resolving a case on a statutory or other alternate ground while

Lee, A.C.J., concurring in part and concurring in the judgment

declining to break new constitutional ground. If that's what the majority were doing, I could understand it as an act of judicial restraint. But that's not what's afoot. We have already broken the constitutional ground at issue—in our decision in *Velarde*. And the majority is openly casting shade on that decision. It is doing so, moreover, without identifying any persuasive ground for questioning the scope of this important decision.

¶84 This is not an act of restraint or judicial "humility." *See supra* ¶ 55 n.14 (quoting *State v. Rowan*, 2017 UT 88, ¶ 27, 416 P.3d 566 (Himonas, J., concurring)). It is an open challenge to the settled state of our case law and our doctrine of *stare decisis*. In questioning *Velarde*—and the reading of that clear decision outlined further below—the court is not declining to decide an unresolved issue. It is reopening a heretofore resolved question, introducing doubt and ambiguity on a point that until today was clearly established. Unless and until the court explains (1) how the "inconsistency" in *Velarde* is any more contradictory than the "inconsistency" in this case and (2) how Argueta can invoke *Doyle* after "br[eaking] the silence guaranteed constitutionally," *Velarde*, 675 P.2d at 1196, it is in no position to claim to be engaged in an act of restraint or humility.

¶85 There is no Fifth Amendment right to tell one story to the police and a different one at trial—at least, not one that allows you to insulate yourself from cross-examination. There is only a right not to be compelled to be a witness against yourself. And that right is in no way implicated in a case like this one where the defendant spoke voluntarily to police and again at trial.

¶86 These conclusions follow clearly from three sets of controlling authorities: (1) longstanding United States Supreme Court precedent limiting the right against self-incrimination by allowing defendants to be cross-examined regarding voluntary statements made during direct examination, *see Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900), or police interrogation, *see Miranda v. Arizona*, 384 U.S. 436, 469 (1966); (2) the Supreme Court's decisions in *Doyle* and *Charles*, which establish that there is no Fifth Amendment bar on "cross-examination that merely inquires into prior inconsistent statements" made voluntarily during a police investigation, *Charles*, 447 U.S. at 408; and (3) our opinion in *Velarde*, which holds that *Charles* extends to the kinds of inconsistencies at issue here—details provided at trial but not given during the initial police investigation, *see* 675 P.2d at 1195–96. I set forth the specific grounds for these conclusions in the three sections that follow.

Lee, A.C.J., concurring in part and concurring in the judgment

### I. *Fitzpatrick* and *Miranda*

¶87 The Fifth Amendment establishes a right against compulsory self-incrimination. It says that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Defendants are thus protected against *compelled* testimony. And that leaves them open to cross-examination about *voluntary* statements given at trial on direct examination, or earlier in the course of pretrial police investigation.

¶88 The first application of this principle is deeply embedded in controlling case law, going back at least as far as *Fitzpatrick v. United States*, 178 U.S. 304 (1900). In *Fitzpatrick*, the Court held that an accused who "waives his constitutional privilege of silence" by "tak[ing] the stand in his own behalf" is subject to cross-examination. *Id.* at 315. So "[w]hile no inference of guilt can be drawn from [the defendant's] refusal to avail himself of the privilege of testifying," the defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Id.* Statements made on direct examination are made voluntarily. And they are thus fair game on cross-examination. In other words, a defendant is treated "with the same latitude as would be exercised in the case of an ordinary witness." *Id.*

¶89 The same goes for statements made voluntarily to police during an investigation. This is a core premise of *Miranda v. Arizona*, 384 U.S. 436 (1966). That case established a warning that informs suspects of their right "to *remain* silent." *Id.* at 444 (emphasis added). But that warning also includes the famous "explanation" that "*anything*" they say "*can* and *will* be used against [them] in court." *Id.* at 469 (emphases added).

¶90 These premises follow naturally from the core guarantee of the Fifth Amendment. The protected right is a right against *compelled* self-incrimination.[24] That right is always subject to

---

[24] *Miranda* protects suspects from coercive interrogations, not inadvisable voluntary statements. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) ("If the individual indicates in any manner, at any time prior to or during *questioning*, that he wishes to remain silent, *the interrogation must cease*." (emphases added) (footnote omitted)); *id.* at 474 ("Without the right to *cut off questioning*, the setting of *in-custody interrogation* operates on the individual to

(continued . . .)

Lee, A.C.J., concurring in part and concurring in the judgment

waiver, as when the defendant decides to speak *voluntarily* about his involvement in a crime. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."). And once a suspect does that, he is in no position to complain about cross-examination highlighting differences between voluntary statements made at two different stages of interaction with the government.

¶91 Argueta cannot and does not assert that his statements to the police were in any way *compelled* or *involuntary*. He gave them voluntarily after he received his *Miranda* warnings—warnings that included the caution that anything he said could and would be used against him in court. And the State made good on that promise. That is all that happened here. Argueta was cross-examined about voluntary statements he made to the police during his voluntary testimony at trial. And he is thus in no position to argue that this cross-examination infringed his Fifth Amendment rights.

## II. *Doyle* and *Charles*

¶92 *Fitzpatrick* and *Miranda* provide the context for and explain the Supreme Court's subsequent decisions in *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Anderson v. Charles*, 447 U.S. 404 (1980). Contrary to Argueta's assertions, these decisions did not establish a right to give two different voluntary statements about a crime and then avoid cross-examination about the differences so long as the statements do not flatly contradict one another. They establish only a narrow limitation on the scope of permissible cross-examination. And they do so in a manner that confirms the propriety of the cross-examination challenged in this case.

---

overcome free choice in producing a statement after the privilege has been once invoked." (emphases added)); *id.* at 478 ("The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, *but whether he can be interrogated.*" (emphasis added)); *id.* ("To summarize, we hold that when an individual is *taken into custody* or otherwise *deprived of his freedom* by the authorities in any significant way *and is subjected to questioning*, the privilege against self-incrimination is jeopardized." (emphases added)).

Lee, A.C.J., concurring in part and concurring in the judgment

¶93 *Doyle* prohibits the prosecution from seeking to impeach a defendant by commenting on his "silence" during a police investigation. 426 U.S. at 617–19. But that holding is tethered to and based on the *Miranda* warning—and the notion that it is fundamentally unfair for the state to advise a suspect that he has the "right to remain silent" only to later highlight his silence as a basis for an inference of guilt at trial. *Id.* And *Charles* offers an important clarification of the *Doyle* principle by holding that there is no infringement of the Fifth Amendment where the cross-examination does not comment on "silence" but instead "inquires into prior inconsistent statements" made voluntarily to the police. 447 U.S. at 408.

¶94 Taken together, *Doyle* and *Charles* sustain the decision of the court of appeals. They clarify that the prosecution is prohibited from commenting on a suspect's invocation of and reliance on the *Miranda* right to remain silent as a basis for an inference of guilt. But they reserve the prosecution's right to pursue cross-examination when the defendant has not exercised the right to remain silent but instead has spoken voluntarily to police and offered an explanation for his involvement in a crime.

A. *Doyle*

¶95 The defendant in *Doyle v. Ohio* was arrested and convicted on charges of drug trafficking. 426 U.S. 610, 611 (1976). At the time of his arrest, he was advised of his *Miranda* right to remain silent. *Id.* at 612. And he exercised that right—he did not speak to the police. Afterward, the defendant took the witness stand and sought to undermine the government's portrayal of a drug deal in which the defendant had stood next to "a well-known 'street person' with a long criminal record," *id.* at 611, who held "a package under his arm, presumably after the transaction" had taken place, *id.* at 612. The defendant testified that in reality the "street person" had "framed" him—that the "street person" was the dealer, and that he (the defendant) had been seeking only to purchase drugs. *Id.* at 613.

¶96 The prosecution sought to undermine the defendant's "framing" defense by questioning the defendant about his silence at the time of the initial police investigation. *Id.* at 613–14. It was in this context that the *Doyle* Court held that "impeachment use of a defendant's post-arrest silence," *id.* at 616, is an infringement of the defendant's constitutional rights—a "fundamentally unfair" move that amounts to "a deprivation of due process," *id.* at 618. Importantly, the *Doyle* Court did not root its decision in some freestanding notion of "fairness" or "due process." It specifically

Lee, A.C.J., concurring in part and concurring in the judgment

based its "fairness" inquiry on the content of the required *Miranda* warning. *See id.* at 617.

¶97 The *Doyle* Court acknowledged that cross-examination regarding a defendant's voluntary "post-arrest *statements*" is entirely appropriate *Id.* (emphasis added). But it viewed commentary on a defendant's post-arrest *silence* as a different matter. The Court noted that *Miranda* "require[s] that a person taken into custody be advised immediately that he has the right to remain silent." *Id.* And it noted that a suspect's "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise" of the *Miranda* right.[25] *Id.* Although "the *Miranda* warnings contain no express assurance that silence will carry no penalty," the Court concluded that "such assurance is implicit to any person who receives the warnings." *Id.* at 618. And "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* (footnote omitted).

¶98 This clear holding of *Doyle* has no purchase in a case like this one. Here, there was no commentary on a defendant's invocation of *silence*, but only commentary about his voluntary *statements*. That is fair game under *Doyle*.

¶99 *Doyle* is based on fundamental fairness concerns rooted in a defendant's reliance on the implied promises of the *Miranda* warnings. There are no such concerns in a case like this one. Argueta was given no "implicit" assurance that his voluntary statements to police would not be used against him. He was told the exact opposite. *See Miranda v. Arizona*, 384 U.S. 436, 469 (establishing the warning that "anything" a suspect says "can and will be used against [him] in court"). So he was in no position to cry foul when his voluntary, post-*Miranda* statements were used for impeachment at trial.

---

[25] Because a defendant's invocation of his right to remain silent must be "unambiguous," a defendant cannot "invoke" his right to remain silent — and thereby put an end to questioning and suppress any subsequent statements he makes — by simply remaining silent for some extended period of time. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). Any statements made after a valid *Miranda* warning are thus fair game in the absence of a clear statement of a desire to remain silent. *See id.* But of course a defendant may always *exercise* his right to remain silent by making no reply at all.

Lee, A.C.J., concurring in part and concurring in the judgment

B. *Charles*

¶100 This reading of *Doyle* is confirmed by the Court's *per curiam* opinion in *Anderson v. Charles*, 447 U.S. 404 (1980). *Charles* reinforced the distinction between an impermissible inference from *silence* (in contravention of the *Miranda* warning) and permissible cross-examination and commentary on *voluntary statements* made to police. *See id.* at 408–409. And it openly rejected a "formalistic" understanding of "silence" that would blur the distinction between the two. *Id.* at 409.

¶101 The defendant in *Charles* was arrested while driving a stolen car—a car that belonged to a man "who had been strangled to death in his Ann Arbor home less than a week earlier." *Id.* at 404. The defendant, found with personal property belonging to the deceased man, was given his *Miranda* warnings and asked about the stolen car. *Id.* at 404–05. He then voluntarily told the investigating officer "that he [had] stole[n] the car in Ann Arbor from the vicinity of Washtenaw and Hill Streets, about two miles from the local bus station." *Id.* at 405. But at trial, the defendant testified that he had taken the "unattended" car in question "from the parking lot of Kelly's Tire Co. in Ann Arbor." *Id.* On cross-examination, the prosecution challenged the trial testimony as a "recent fabrication" and asked the defendant why he hadn't told "anybody at the time [he was] arrested, where [he] got that car." *Id.* at 406. The prosecution also emphasized that the defendant had previously told an investigating police officer that he had stolen the car from "Washtenaw and Hill Street." *Id.*

¶102 The defendant subsequently filed a federal habeas petition. *Id.* The Sixth Circuit held that "the prosecutor's questions about [the defendant's] post-arrest failure to tell officers the same story he told the jury violated due process under the rule of *Doyle v. Ohio*." *Id.* at 407 (citation and internal quotation marks omitted). But the Supreme Court reversed, emphasizing many of the points that I have highlighted above.

¶103 First, the *Charles* Court highlighted the limited nature of the *Doyle* holding. "*Doyle* bars the use against a criminal defendant of *silence* maintained after receipt of governmental assurances." *Id.* at 408 (emphasis added). It "does not apply to cross-examination that merely inquires into prior inconsistent statements." *Id.* "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* "As to the subject matter of his statements, the defendant has not remained silent at all." *Id.*

Lee, A.C.J., concurring in part and concurring in the judgment

¶104 Second, the *Charles* Court acknowledged that the line between silence and prior statements could be considered fuzzy. It noted that the Sixth Circuit had adopted a reading of *Doyle* that would bar questions that concerned a defendant's "failure to tell arresting officers the *same story* he told the jury." *Id.* (emphasis added) (citation omitted). And it conceded that there is a sense in which the failure to tell the same story told on a previous occasion "may be said to involve 'silence' insofar as it omits facts included in the other version." *Id.* at 409. But the *Charles* Court expressly repudiated this "formalistic understanding of 'silence.'" *Id.* In place of that view, the Court reinforced the Fifth Amendment principles at the heart of *Miranda* and *Doyle*, holding that *Doyle* is implicated only when the prosecution makes reference to a defendant's "exercise of his right to remain silent." *Id.* at 408 (citation omitted); *see also id.* at 409 (noting that a question that seeks only "to elicit an explanation for a prior inconsistent statement" is not a question that seeks to "draw meaning from silence," and is thus constitutional under *Doyle*).

¶105 These principles again reinforce the court of appeals' analysis in this case. There may be a metaphysical sense in which questions about perceived differences between Argueta's voluntary statements on the night of his arrest and his trial testimony comment on "silence"—one story "omits facts included in the other version." *Id.* at 409. But this does not offend the Fifth Amendment under *Charles*. The "formalistic" sense in which the prosecution's cross-examination amounts to commentary on Argueta's "silence" is beside the point—the key question is whether the prosecution has asked the jury to infer guilt from a defendant's invocation of the right to remain silent set forth in the *Miranda* warning. Where (as here) that is not the case, there is no *Doyle* violation. There is only a fair commentary on differences between two voluntary stories told by the defendant. And this kind of commentary is the core of cross-examination and in no way violates the Fifth Amendment.

## III. *Velarde*

¶106 The above establishes the propriety of the prosecution's cross-examination and closing argument in this case under controlling precedent of the United States Supreme Court. But any arguable doubt on the matter is resolved by our decision in *State v. Velarde*, 675 P.2d 1194 (Utah 1984). *Velarde* is directly on point and directly controlling as a matter of *stare decisis*. The majority unsettles our law by suggesting otherwise.

Lee, A.C.J., concurring in part and concurring in the judgment

¶107 *Velarde* accepts the above understanding of the *Charles* opinion. It also goes further, resolving any remaining doubts of relevance to this case. *Velarde* holds that *Doyle* may be invoked only after "an initial *and sustained* silence" once *Miranda* warnings are given. *Id.* at 1196 (emphasis added). And it expressly holds that *Charles* permits cross-examination aimed at highlighting inconsistencies between two voluntary statements by the defendant—whether the inconsistencies are mere *differences* or outright *contradictions*.

¶108 The police confronted the defendant in *Velarde* after pursuing a tip and finding him asleep in a truck in front of a Morgan, Utah café at 2:00 a.m. *Id.* at 1195. After the police officer confirmed that the truck was stolen, he arrested Velarde and gave him his *Miranda* warnings. *Id.* In response to the officer's questions, Velarde volunteered that he did not own the truck, that he had arrived at the café in the truck, and that he did not know he was in Morgan. *Id.* But he gave no other details. "At no time did defendant assert any right to remain silent." *Id.*

¶109 Velarde later testified at trial. There, he gave additional details that he had not provided at the time of his arrest. He stated that another man had "picked him up [in the truck] in Salt Lake City," "driven past" the defendant's home, and "stayed on the freeway all the way to Morgan," where the other man lived. *Id.* The prosecution then sought to impeach the defendant on the basis of the differences between the story he told at trial and the voluntary statements he had made to the police officer. *Id.*

¶110 On appeal, the defendant asserted that this cross-examination constituted commentary on his "silence" and therefore infringed his Fifth Amendment rights under *Doyle*. *Id.* We rejected that argument. We held that the "inconsistency of [the defendant's trial] testimony with what defendant had told the officer" was a "legitimate basis for a prosecutor's testing the credibility of a witness by way of impeachment." *Id.* And we emphasized that the defendant had "waived" his "Fifth Amendment guarantee to remain silent" by "talking freely with the officer" about the crime after receiving his *Miranda* warnings, and had done so again when he "took the witness stand." *Id.*

¶111 That analysis is directly controlling here. *Velarde* makes clear that there is no Fifth Amendment bar on cross-examination or commentary that is aimed at highlighting differences between two stories told voluntarily by a defendant. And it emphasizes that the differences explored need not be limited to outright contradictions.

Lee, A.C.J., concurring in part and concurring in the judgment

*Velarde* speaks of "inconsistency." *Id.* But the inconsistency at issue there, as here, involved mere differences—additional details recounted at trial that were not given to police. In *Velarde*, after all, it was entirely possible for the defendant to have both (a) not owned the truck, arrived in Morgan in the truck, and not known he was in Morgan at the time of his arrest (as he told the police), and (b) been picked up in Salt Lake and driven to Morgan in the truck by another person (as he testified at trial).[26] Yet we spoke of these differences as *inconsistencies* that opened the door to cross-examination. *Id.* And we emphasized that the defendant had

---

[26] In resisting this straightforward conclusion, the majority notes that Velarde (a) "told the officer that arrested him that he did not own the truck and that he had no idea he was in Morgan," and (b) testified at trial "that someone with a truck picked him up and they drove together to Morgan, where that person lived." *Supra* ¶ 51. That is correct. But it does not distinguish *Velarde* from this case—it highlights the parallelism between the two cases.

The two stories told by Velarde were not directly contradictory. By the time of trial, Velarde had of course discovered where he had been on the night in question—he was on trial for a charge on which he was arrested *in Morgan*. So in explaining that it was another man who had driven him to Morgan, Velarde wasn't suddenly claiming that he had known he was in Morgan the night he was arrested. To the extent there was any inconsistency, it was in the *embellishments* and *details* relayed at trial (and not recounted during the pretrial investigation).

That is exactly the situation here. Argueta, like Velarde, "freely told the officer that arrested him," *supra* ¶ 51, that he had met the victim at a bar, come to her apartment, noticed the keys in the door, and entered to place the keys on the dresser. "Then, at trial, he testified altogether differently . . . ." *Supra* ¶ 51. He not only provided elaborate details about meeting both the victim *and her ex-boyfriend* at a bar—driving home together, sharing a beer, and lending twenty dollars to the victim's ex-boyfriend—he claimed that he had tried to collect the debt some five or six times before, and that recovering that eighteen-month-old debt had been the reason for his presence at the apartment. Like Velarde's additional details, Argueta's embellishments were surprising and arguably suspicious, but ultimately reconcilable. It was perfectly possible for every statement to be true. And if *Velarde* involved an "inconsistency" on which it was fair game for the prosecutor to comment, then the same holds true here.

Lee, A.C.J., concurring in part and concurring in the judgment

waived his right to remain silent by speaking "freely with the officer."[27] *Id.*

¶112 The majority asserts that *Velarde* "tells us little to nothing about cases" where the alleged inconsistency involves details told at trial that were not relayed previously. *Supra* ¶ 54. But that is incorrect. This case is on all fours with *Velarde*. The inconsistency we encounter today is exactly the kind of inconsistency we encountered in *Velarde*. *See supra* ¶¶ 111, 111 n.26.

¶113 The majority resists this conclusion. It says that *Velarde* could not have addressed whether "inconsistent" statements include differences as well as outright contradictions, *see supra* ¶ 53, because *Velarde* did not use the "key words" "'supplemental,' 'different,' or 'reconcilable,'"[28] *supra* ¶ 54 n.12. I don't follow. The

---

[27] The majority also tries to distinguish *Velarde* by pointing to the fact that Argueta invoked his right to remain silent, while Velarde did not. *See supra* ¶ 51. But Argueta immediately *waived* that right by blurting out his initial, incomplete explanation from the curb—"he freely told the officer that arrested him," *supra* ¶ 51, that he had met the victim at the bar and entered to place the keys on the dresser. These statements were not protected as involuntary—as evidenced by their admission into evidence at trial. *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (holding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off *questioning*' was 'scrupulously honored'" (emphasis added)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.") And *Velarde* tells us precisely what to do in that situation: "[I]n order to assert the [*Doyle*] privilege[,] there must be an initial *and sustained* silence after the *Miranda* warning is given." 675 P.2d at 1196 (emphasis added). But Argueta, like Velarde, "broke the silence guaranteed constitutionally," *id.*, and is thus in no position to invoke *Doyle*—a point that remains unrefuted by the majority.

[28] This is a strange charge coming from a majority unconcerned with the "key words" that *do* appear in *Velarde*. *See supra* ¶¶ 82, 107, 111 n.27 (highlighting *Velarde*'s requirement that a defendant invoking *Doyle* must be able to show an "initial *and sustained*

(continued . . .)

Lee, A.C.J., concurring in part and concurring in the judgment

doctrine of *stare decisis* "requires," at a minimum, "that a decision rendered by a court in a particular factual context govern later decisions by that court arising under the same or similar facts." *State v. Sims*, 881 P.2d 840, 843 n.7 (Utah 1994). And that principle requires our application of the *Velarde* holding here—a decision giving "inconsistent" the content it *must* have had in order for the *Velarde* court to come to the decision it did. Both Argueta's and Velarde's statements were (1) voluntary and (2) ultimately reconcilable, *supra* ¶¶ 111, 111 n.26—and Velarde's were deemed "inconsistent." *Velarde*, 675 P.2d at 1196 (citation omitted). That should be the end of the matter. *See Steiner Corp. v. Auditing Div. of Utah State Tax Comm'n*, 1999 UT 53, ¶ 12, 979 P.2d 357 ("*Stare decisis* means that like facts will receive like treatment in a court of law." (citation omitted)).

¶114 The majority also claims that we have not decided where embellishments like Argueta's "'fall' within the spectrum between *Doyle* and *Charles*." *See supra* ¶ 49. But I'm not sure how *Velarde* could have been any clearer. That opinion went to great lengths to distinguish the circumstance presented in a case like this one (and *Charles* and *Velarde*) from the situation in *Doyle*. It noted that "[t]he rationale which the Supreme Court [had] adopted for its decision in *Doyle*" was that it was "fundamentally unfair for the prosecution to impose a penalty at trial on a defendant who has exercised [his] right by choosing to remain silent." *Velarde*, 675 P.2d at 1195–96 (quoting *United States v. Agee*, 597 F.2d 350 (3d Cir. 1979)). It reasoned that "[t]he very statement of that rationale demonstrates that *Doyle* can have no application to a case in which the defendant did *not* exercise his right to remain silent." *Id.* at 1196 (quoting *Agee*, 597 P.2d 350). And it reinforced the straightforward reading of *Charles* that allows "cross-examination that merely inquires into prior inconsistent statements," given that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* (quoting *Charles*, 447 U.S. at 408). Again, it deemed "inconsistency" to encompass not just outright contradictions but mere differences between a defendant's two voluntary accounts. *Supra* ¶¶ 111, 111 n.26. In these circumstances, *Velarde* makes clear that the prosecutor's inquiries "make[] no

_____

silence" and must not have "broke[n] the silence guaranteed constitutionally" (citations omitted)); *infra* ¶ 114 (highlighting the *Velarde* court's holding that "*Doyle* can have no application to a case in which the defendant did *not* exercise his right to remain silent").

Lee, A.C.J., concurring in part and concurring in the judgment

unfair use of silence." 675 P.2d at 1196 (quoting *Charles*, 447 U.S. at 408).

¶115 These are precisely the circumstances of this case. And *Velarde* is accordingly controlling and entitled to respect as a matter of *stare decisis*. If the majority wishes to walk back *Velarde* it should do so transparently — and with something more than the truism that *Velarde* is less than two pages long and has been cited only once for the proposition that a defendant's "inconsistent testimony is legitimate basis for prosecutor's questioning his credibility." *See supra* ¶¶ 53–54 (citation omitted). I don't see how a case being short or cited only for its holding undermines its holding. If the court has doubts about *Velarde*, it should own that position and justify it under our doctrine of *stare decisis*. In the absence of such justification, *Velarde* is controlling.

¶116 I would so hold. And I would affirm the court of appeals' analysis under *Velarde*'s authority.

––––––––––––